Filed 6/2/16; Pub. order 6/20/16 (see end of opn.)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| DEBORAH MOORE, | D067120 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2013-00032193-CU-OE-CTL) |
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of San Diego County, Katherine A. Bacal, Judge.  Affirmed in part, reversed in part, remanded for further proceedings.  Request for judicial notice granted.

Sheik Law and Mani Sheik for Plaintiff and Appellant.

Andrews · Lagasse · Branch · Bell, Margaret C. Bell and Lisa M. Magorien for Defendant and Respondent.

# I.

## INTRODUCTION

Plaintiff Deborah Moore appeals from a judgment entered in favor of defendant The Regents of the University of California (Defendant). Moore sued Defendant for claims under the Fair Employment and Housing Act (FEHA) (Gov. Code,[1] §§ 12900-12966) and the California Family Rights Act (CFRA) (§§ 12945.1, 12945.2).

The trial court granted summary judgment in favor of Defendant. Our review of the record demonstrates that summary judgment was improperly granted with respect to Moore's first, second, third, fifth and sixth causes of action. Summary adjudication in favor of Defendant was appropriate, however, with respect to Moore's fourth cause of action.

We reverse the judgment and remand the matter for further proceedings in the trial court.

# II.

## FACTUAL AND PROCEDURAL BACKGROUND

A.   *Factual background*

Moore began working in UCSD's Marketing and Communications Department (the Department) in 2008. In February 2010, Moore became the Director of Marketing. Around that same time, the Executive Director of the Department resigned unexpectedly.

---

[1]    Further statutory references are to the Government Code unless otherwise indicated.

2

In June 2010, Kimberly Kennedy was hired as the new Executive Director of the Department. According to a declaration submitted in support of Defendant's motion for summary judgment, after she was hired, Kennedy sought to restructure the department.

In early September 2010, Moore was diagnosed with idiopathic cardiomyopathy. On or around September 10, 2010, Moore was prescribed and began wearing a heart monitor called a "LifeVest." The "LifeVest" is a monitor and external defibrillator. The "LifeVest" is worn outside of a person's clothing, like a vest, and the monitor, which is approximately six or eight inches by four to five inches in size, is attached to the vest by wires. Moore had to wear the "LifeVest" for two to three weeks.

On the first day that Moore wore the vest to work, she met with Kennedy. Moore "told [Kennedy] what [her] condition was," "told her what the heart monitor was for," and informed Kennedy "that there was nothing to worry about, that it would take care of itself." Moore also told Kennedy that she "would be able to do [her] job, no problem, just continue," that she did not feel any different, and that she would be doing therapy and taking medication to see whether her heart condition improved. If her condition did not improve, she would be getting a device similar to a pacemaker. Moore told Kennedy, "I'm fine, seriously." At that first meeting, in response to Moore informing Kennedy that she could "do [her] work and [her] job fine," Kennedy responded, " 'The first thing we need to do is lighten your load to get rid of some of the stress.' "

After speaking with Moore, Kennedy spoke with someone in the human resources department and asked, " '[I]f I have an employee who has a medical event, do I call the hospital or do I call- like, who do I call.' " Kennedy also requested from human resources

information on what to do about an employee "with *adverse* health issues." (Italics added.)

When Moore was told that she no longer needed to wear the "LifeVest," and that it had been "overprescribed" to her, she informed Kennedy about the change. Kennedy told Moore that she had "been in touch with HR" to ask "how to handle [Moore] *as a liability to the department*." (Italics added.)

Moore testified that her relationship with Kennedy changed after Kennedy became aware of Moore's heart condition. Based on this perceived change, Moore believed that Kennedy did not like the fact that Moore had a heart condition. Moore related a few instances in which she believed that Kennedy had unfairly criticized her work product, including Kennedy yelling at Moore in January 2011 regarding an advertising project, Kennedy seeking to change "the branding process to 'be her own,' " and Kennedy being "hostile and snippy" when informing Moore and advertising agency representatives that she did not want to use the music that Moore and some coworkers had chosen for a commercial. Moore also testified that during three different meetings, Kennedy had "humiliated" Moore in disagreeing with the department's "previous branding look," which Moore had had a role in creating.

According to Moore, after Kennedy became aware of Moore's heart condition, she began eliminating Moore's "main responsibilities," including her work on an "open enrollment program and advertising." Moore did not know why Kennedy reassigned the open enrollment program to someone else. In addition, Kennedy began overseeing the advertising herself rather than allowing Moore to continue doing so. Kennedy had started

4

"sending work to freelancers," including work that had previously been done internally. While Kennedy initially had Moore "oversee" the work of the freelancers, Kennedy later "took [Moore] off of overseeing the freelancers."

In addition, as of November 2010, Kennedy began to meet with two of Moore's "reports" on issues that Moore believed she should have been overseeing. Kennedy also began arranging meetings that Moore had previously been in charge of coordinating.

Moore testified that Kennedy assigned Moore to work on " 'less important' " projects, such as " secondary things to do that [Kennedy] didn't consider important to the department but had to be done." According to Moore, Kennedy was "taking away [Moore's] job responsibilities," and Moore came to believe that Kennedy "was positioning to get rid of [Moore]."

In approximately mid-November 2010, Kennedy demoted Moore, through a Department restructuring, to a new classification. Moore's new title became "Director of Marketing and Brand Management." Moore's salary did not change, but certain other benefits were reduced. Also in November 2010, Kennedy implemented reclassifications of Department positions and laid off two full-time employees.[2] At that time, Kennedy told her staff that this "was the last layoff that was going to happen."

Moore told Kennedy in December 2010 that she would likely have to have a pacemaker surgically implanted in early 2011 and would need "only" a "few days off work." In January 2011, Moore informed Kennedy that she had postponed her surgery

---

[2]    Two or three other employees apparently voluntarily left the Department during this time frame.

and "would need 'like two or three' days off in April 2011." Kennedy did not say anything in response to Moore's statements regarding the need for time off for surgery. Kennedy has no recollection of discussing Moore's need for surgery or her statements about having to take time off for such surgery.

On February 2, 2011, Kennedy sent an e-mail to Courtney Morris, a Director of Compensation and Benefits in the Human Resources Department, indicating that she wanted to eliminate Moore's position, effectively terminating Moore's employment, as of February 15, 2011. According to Kennedy, the job functions that Moore was performing had decreased to such a point that Kennedy could assume them, and therefore, Kennedy decided to eliminate Moore's position.

In response to Kennedy's e-mail regarding the elimination of Moore's position, Morris asked Kennedy to "please explain why Karen [Shea] should be retained out of seniority (see policy clause below). I want to make sure that this is reflected in the file." The policy to which Morris was referring stated:

> "Indefinite layoff and indefinite reduction in time are effected by unit, by classification, and by salary grade (in the event of a classification assigned to different salary grades) in inverse order of seniority, except that an employee may be retained irrespective of seniority if that employee possesses special skills, knowledge, or abilities that are not possessed by other employees in the same classification and same salary grade (in the event of a classification assigned to different salary grades), and which are necessary to maintain the operations of the department."

At the time Kennedy requested to eliminate Moore's position and terminate her employment, Moore and Shea "f[e]ll in the same payroll, title, and the same classification."

6

Kennedy's response to Morris's request for an explanation as to why Kennedy was not adhering to the policy with respect to Moore and Shea was as follows:

> "Elimination of the position [of Marketing Director] is due to the focus of the marketing department moving to the service lines and away from a central marketing professional servicing a [*sic*] all service lines and department. . . . There is no need for two director level positions in the marketing area. [Deb Moore and Karen Shea]. [¶] In addition, I have taken over management of all brand issues and am the main point of contact with our advertising agency and advertising buyer. I also make all decisions regarding brand and identity as well as appoint all vendors. There is duplication in elements of my role with that of the Marketing Manager and again indicates that we do not need this resource."

Thus, in responding to the request from Human Resources for an explanation as to why the policy was not being followed, Kennedy explained the reasons for the elimination of Moore's position, but did not provide information regarding her assessment as to any "special skills, knowledge, or abilities" that Shea possessed and Moore did not. Kennedy conceded during her deposition that Moore "[p]robably" had the "skills to fill" the role that Shea fulfilled. Kennedy also acknowledged that Shea had "only held that role for a few months" at the time Moore was terminated.

Defendant also has a policy regarding a reduction in force that requires Defendant to " '[g]ive regular status employees preferential opportunities for reassignment or transfer prior to indefinite layoff.' " As interpreted by Andrea Balestrieri, Defendant's identified person most knowledgeable about reduction in force policies in effect at the time of Moore's termination, the "idea [behind the policy] is to minimize impact to employees and to minimize the need to lay someone off." Balestrieri also testified regarding another policy referred to as a "right to recall." Pursuant to this policy, "if a

7

position is opened after an individual is laid off and the position is in the same classification, the same salary grade, they would have the right to recall"—i.e., be rehired into that position.

Defendant eliminated Moore's position on February 15, 2011, and Moore was terminated. Moore was informed that she was being laid off because her position was being eliminated due to "lack of work" and "budget reasons."

Shea testified that after Moore was terminated, Kennedy and Shea discussed "[Shea] taking over duties that Deb Moore used to have," and that some of Moore's "direct reports reported in to [Shea] for a short period of time," after which they reported to "Beth Reagan, who reported directly to Kim Kennedy." Moore understood that her "position and [her] tasks were given to somebody else on staff there who just had a slightly different title."

A year and a half after terminating Moore, Kennedy "made some additional restructuring redundancies."

Evidence presented on summary judgment demonstrated that at the time Kennedy was hired, the Department consisted of 15 full-time employees and approximately 5 temporary employees. However, between November 2010 and May 2011, the Department increased its headcount by eight employees. The most significant increases in staff were in the internet marketing and design and production areas. Kennedy was aware that Moore had a design and production background, and, in fact, that Moore's career had been devoted to being a graphic designer, production manager, and art

8

director. Kennedy acknowledged that Moore had an "extensive background in design and production."

Kennedy did not ask Moore if she would accept a pay reduction, nor did Kennedy consider Moore for a freelance position. There is no evidence that Kennedy offered Moore any of the positions that were filled around the time of, or after, her termination.

B. *Procedural background*

Moore filed her complaint on January 28, 2013, alleging causes of action under FEHA for disability discrimination, failure to accommodate, failure to engage in the interactive process, and retaliation, as well as causes of action for interference with CFRA and retaliation in violation of CFRA.

Defendant moved for summary judgment a little over a year after the case was filed. The trial court ruled in favor of Defendant on the motion, concluding that Moore had not demonstrated that there remained triable issues of material fact with respect to any of her causes of action.

The trial court subsequently entered judgment in favor of Defendant. Moore filed a timely notice of appeal from the judgment.

III.

DISCUSSION

A. *Applicable legal standards*

1. *Summary judgment standards*

"Summary judgment is granted when a moving party establishes the right to the entry of judgment as a matter of law. [Citation.] On appeal, the reviewing court makes

9

' "an independent assessment of the correctness of the trial court's ruling, applying the same legal standard as the trial court in determining whether there are any genuine issues of material fact or whether the moving party is entitled to judgment as a matter of law." ' " (*Hesperia Citizens for Responsible Development v. City of Hesperia* (2007) 151 Cal.App.4th 653, 658.)

In independently examining the record on appeal "to determine whether triable issues of material fact exist," we " 'consider[ ] all the evidence set forth in the moving and opposition papers except that to which objections were made and sustained.' " (*Ambriz v. Kelegian* (2007) 146 Cal.App.4th 1519, 1530 (*Ambriz*).)  Further, " 'we must view the evidence in a light favorable to plaintiff as the losing party [citation], liberally construing [the plaintiff's] evidentiary submission while strictly scrutinizing the defendants' own showing, and resolving any evidentiary doubts or ambiguities in plaintiff's favor.' " (*Ibid.*)

" 'In the summary judgment context, . . . the evidence must be incapable of supporting a judgment for the losing party in order to validate the summary judgment.' " (*Faust v. California Portland Cement Co*. (2007) 150 Cal.App.4th 864, 877 (*Faust*), italics added.)  " 'Thus *even though it may appear that a trial court took a "reasonable" view of the evidence*, a summary judgment cannot properly be affirmed *unless a contrary view would be unreasonable as a matter of law* in the circumstances presented.' " (*Ibid*, italics added.)

2.     *Overview of FEHA and CFRA*

a.     *Overview of FEHA as relevant to Moore's case*

FEHA makes it an unlawful employment practice to discharge a person from employment or discriminate against the person in the terms, conditions, or privileges of employment because of physical or mental disability or medical condition.  (§ 12940, subd. (a).)  FEHA, however, "does not prohibit an employer from . . . discharging an employee with a physical or mental disability, . . . where the employee, because of his or her physical or mental disability, is unable to perform his or her essential duties even with reasonable accommodations . . . ."  (§ 12940, subd. (a)(1).)  FEHA proscribes two types of disability discrimination:  (1) discrimination arising from an employer's intentionally discriminatory act against an employee because of his or her disability (disparate treatment discrimination), and (2) discrimination resulting from an employer's facially neutral practice or policy that has a disproportionate effect on employees suffering from a disability (disparate impact discrimination).  (*Knight v. Hayward Unified School Dist.* (2005) 132 Cal.App.4th 121, 128-129, disapproved on other grounds in *Williams v. Chino Valley Independent Fire Dist.* (2015) 61 Cal.4th 97, 115.)

FEHA also imposes on the employer the obligation to make reasonable accommodation:  "It is an unlawful employment practice, unless based upon a bona fide occupational qualification, or, except where based upon applicable security regulations established by the United States or the State of California:  [¶] . . . [¶] (m) (1) For an employer or other entity covered by this part to fail to make reasonable accommodation for the known physical or mental disability of an applicant or employee."  (§ 12940,

11

subd. (m).)  An employer is not required to make an accommodation "that is demonstrated by the employer or other covered entity to produce undue hardship . . . to its operation."  (*Ibid.*)

Corresponding with the obligation to make reasonable accommodation for a known physical or mental disability, FEHA makes it unlawful for an employer "to fail to engage in a timely, good faith, interactive process with the employee or applicant to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation by an employee or applicant with a known physical or mental disability or known medical condition."  (§ 12940, subd. (n).)  Section 12940, subdivision (n) imposes separate, independent duties on an employer to engage in the " 'interactive process' " and to make " 'reasonable accommodations.' "  (*Wilson v. County of Orange* (2009) 169 Cal.App.4th 1185, 1193.)

FEHA also makes it unlawful for an employer "to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part."  (§ 12940, subd. (h).)

    b.  *Overview of CFRA as relevant to Moore's case*

CFRA, the California corollary to the federal Family and Medical Leave Act of 1993 (29 U.S.C. §§ 2601-2654 (FMLA)), "is intended to give employees an opportunity to take leave from work for certain personal or family medical reasons without jeopardizing job security."  (*Nelson v. United Technologies* (1999) 74 Cal.App.4th 597, 606; *Faust*, *supra*, 150 Cal.App.4th at p. 878.)  CFRA requires an employer of 50 or

more persons to grant a request by a qualified employee to take up to 12 weeks in any 12-month period for family care or medical leave. (§ 12945.2, subds. (a), (c)(2)(A); see *Faust*, *supra*, at p. 878.) Grounds for leave include family needs such as the birth or adoption of a child, serious illness of a family member and "an employee's own serious health condition" when that condition "makes the employee unable to perform the functions of the position of that employee . . . ." (§ 12945.2, subd. (c)(3)(C).) CFRA defines a "[s]erious health condition" as "an illness, injury, impairment, or physical or mental condition that involves either of the following: [¶] (A) Inpatient care in a hospital, hospice, or residential health care facility. [¶] (B) Continuing treatment or continuing supervision by a health care provider." (§ 12945.2, subd. (c)(8).) An employer may require an employee's request for leave be supported by a certification from the employee's health care provider. (*Id.*, subd. (k)(1).)

"Violations of . . . CFRA generally fall into two types of claims: (1) 'interference' claims in which an employee alleges that an employer denied or interfered with her substantive rights to protected medical leave, and (2) 'retaliation' claims in which an employee alleges that she suffered an adverse employment action for exercising her right to CFRA leave." (*Rogers v. County of Los Angeles* (2011) 198 Cal.App.4th 480, 487-88.) The statutory authority for an "interference" claim arises from section 12945.2, subdivision (t), which makes it unlawful for an employer "to interfere with, restrain, or deny the exercise of, or the attempt to exercise, any right" provided by CFRA. The statutory authority for a "retaliation" claim arises from section 12945.2, subdivision

(*l*)(1), which makes it unlawful to retaliate against any individual because of his or her exercise of the right to family care or medical leave as provided by CFRA.

B.      *Moore's first cause of action for disability discrimination under FEHA*

        1.      *Standards applicable to discrimination claims*

"Because of the similarity between state and federal employment discrimination laws, California courts look to pertinent federal precedent when applying our own statutes." (*Guz v. Bechtel National, Inc*. (2000) 24 Cal.4th 317, 354 (*Guz*).)

In order to prevail on a FEHA discrimination claim, a " 'plaintiff must produce evidence sufficient to show that an illegitimate criterion was a *substantial factor* in the particular employment decision.' " (*Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 232.)

Because a plaintiff does not often possess or obtain direct evidence that an illegitimate criterion was a substantial factor in a particular employment decision, California has adopted the three-stage burden-shifting test for discrimination claims set forth in *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792. (*Guz, supra*, 24 Cal.4th at pp. 354-356.)[3] "This so-called *McDonnell Douglas* test reflects the principle

---

[3]      Recently, another appellate court has explained that disability discrimination cases often may be an exception to the general rule that plaintiffs alleging discrimination are unable to present direct evidence of the discrimination. "[D]isability discrimination cases often involve direct evidence of the role of the employee's actual or perceived disability in the employer's decision to implement an adverse employment action," and "[i]nstead of litigating the employer's reasons for the action, the parties' disputes in disability cases [often] focus on whether the employee was able to perform essential job functions, whether there were reasonable accommodations that would have allowed the employee to perform those functions, and whether a reasonable accommodation would have imposed

14

that direct evidence of intentional discrimination is rare, and that such claims must usually be proved circumstantially. Thus, by successive steps of increasingly narrow focus, the test allows discrimination to be inferred from facts that create a reasonable likelihood of bias and are not satisfactorily explained." (*Guz*, *supra*, 24 Cal.4th at p. 354; see also *Mixon v. Fair Employment & Housing Com.* (1987) 192 Cal.App.3d 1306, 1317 ["In most cases, the complainant will be unable to produce direct evidence of the employer's intent. Consequently certain rules regarding the allocation of burdens and order of presentation of proof have developed in order to achieve a fair determination of 'the elusive factual question of intentional discrimination' "].)

"At trial, the *McDonnell Douglas* test places on the plaintiff the initial burden to establish a prima facie case of discrimination. This step is designed to eliminate at the outset the most patently meritless claims, as where the plaintiff is not a member of the protected class or was clearly unqualified, or where the job he sought was withdrawn and never filled." (*Guz*, *supra*, 24 Cal.4th at pp. 354-355.) The plaintiff can meet his or her burden of establishing a prima facie case of discrimination by presenting evidence that demonstrates, even circumstantially or by inference, that he or she (1) suffered from a disability, or was regarded as suffering from a disability; (2) could perform the essential duties of the job with or without reasonable accommodations, and (3) was subjected to an

an undue hardship on the employer." (*Wallace v. County of Stanislaus* (2016) 245 Cal.App.4th 109, 123 (*Wallace*).) In cases where a "plaintiff presents direct evidence of the employer's motivation for the adverse employment action," the *McDonnell Douglas* "three-stage framework and the many principles adopted to guide its application do not apply." (*Ibid.*) This case does not present a so-called "typical" disability discrimination case, as described in *Wallace*, in that the parties dispute the employer's reasons for terminating Moore's employment.

15

adverse employment action because of the disability or perceived disability.  (*Jensen v. Wells Fargo Bank* (2000) 85 Cal.App.4th 245, 254 (*Jensen*).)  To establish a prima facie case, a plaintiff must show " ' " 'actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were "based on a [prohibited] discriminatory criterion . . . ." ' " ' "  (*Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 520, fn. 2.)  The prima facie burden is light; the evidence necessary to sustain the burden is minimal.  (*Heard v. Lockheed Missiles & Space Co.* (1996) 44 Cal.App.4th 1735, 1751.)  Generally, an employee need offer only sufficient circumstantial evidence to give rise to a reasonable inference of discrimination.  (*Hersant v. Department of Social Services* (1997) 57 Cal.App.4th 997, 1002 (*Hersant*) [explaining nature of prima facie case in context of age discrimination].)

"If, at trial, the plaintiff establishes a prima facie case, a presumption of discrimination arises."  (*Guz*, *supra*, 24 Cal.4th at p. 355.)  "Accordingly, at this trial stage, the burden shifts to the employer to rebut the presumption by producing admissible evidence, sufficient to 'raise[ ] a genuine issue of fact' and to 'justify a judgment for the [employer],' that its action was taken for a legitimate, nondiscriminatory reason."  (*Id.* at pp. 355-356.)

"If the employer sustains this burden [to demonstrate a genuine issue of fact that the action was for a legitimate, nondiscriminatory reason], the presumption of discrimination disappears.  [Citations.]  The plaintiff must then have the opportunity to attack the employer's proffered reasons as pretexts for discrimination, or to offer any other evidence of discriminatory motive.  [Citations.]  In an appropriate case, evidence of

16

dishonest reasons, considered together with the elements of the prima facie case, may permit a finding of prohibited bias." (*Guz*, *supra*, 24 Cal.4th at p. 356.)

In demonstrating that an employer's proffered nondiscriminatory reason is false or pretextual, " '[an employee] cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. . . . Rather, the [employee] must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them "unworthy of credence," . . . and hence infer "that the employer did not act for the [asserted] non-discriminatory reasons." ' " (*Hersant*, *supra*, 57 Cal.App.4th at p. 1005.)

2.      *Summary judgment in the context of a discrimination claim*

" '[W]e must keep in mind that the *McDonnell Douglas* test was originally developed for use at trial [citation], not in summary judgment proceedings.' " (*Arteaga v. Brink's, Inc.* (2008) 163 Cal.App.4th 327, 343-344.)

> " ' "In such pretrial [motion] proceedings, the trial court will be called upon to decide if the plaintiff has met his or her burden of establishing a prima facie case of unlawful discrimination. If the employer presents admissible evidence either that one or more of plaintiff's prima facie elements is lacking, or that the adverse employment action was based on legitimate, nondiscriminatory factors, the employer will be entitled to summary judgment *unless the plaintiff produces admissible evidence which raises a triable issue of fact material to the defendant's showing*. In short, by applying *McDonnell Douglas*'s shifting burdens of production in the context of a motion for summary judgment, 'the judge [will] determine whether the litigants have created an issue of fact to be decided by the jury.' " . . . Thus, " '[a]lthough the burden of proof in

17

a [discrimination] action claiming an unjustifiable [termination] ultimately rests with the plaintiff . . . , in the case of a motion for summary judgment or summary issue adjudication, *the burden rests with the moving party to negate the plaintiff's right to prevail on a particular issue*. . . . In other words, the burden is reversed in the case of a summary issue adjudication or summary judgment motion. . . .' " ' " (*Id.* at p. 344, first & second italics in original, third italics added.)

" 'Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors. These include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case . . . .' " (*Guz, supra*, 24 Cal.4th at p. 362.) However, "many employment cases present issues of intent, . . . motive, and hostile working environment, issues not determinable on paper. Such cases . . . *are rarely appropriate for disposition on summary judgment*, however liberalized [summary judgment standards may] be." (*Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 286 (*Nazir*), italics added.)

3. *Analysis*

The trial court determined that Moore satisfactorily demonstrated a prima facie case of discrimination under FEHA. Although the court concluded that the undisputed evidence established that Moore was not, in fact, physically disabled, the court determined that there nevertheless remained a question of fact as to whether Defendant *perceived* Moore as having a disability. The court concluded that the undisputed evidence demonstrated that Moore was qualified to perform the duties of her position, stating that "[b]ecause plaintiff was not terminated for cause, there is no issue regarding

18

plaintiff's ability to perform the work."  Finally, the court concluded that the temporal connection between the time Kennedy became aware of Moore's heart condition and Moore's termination was sufficient to satisfy the final element of a prima facie case of discrimination.

The court then considered the evidence presented by Defendant with respect to offering a legitimate, nondiscriminatory basis for Moore's termination.  The court concluded that Defendant's evidence was sufficient to meet this standard.

However, with respect to the third stage of the *McDonnell Douglas* burden shifting test—i.e., Moore's proffer regarding pretext and/or discriminatory motive to overcome Defendant's offer of a nondiscriminatory reason for her termination—the trial court concluded that "[b]ased on all the evidence presented, plaintiff has not raised a triable issue of fact with respect to her claim of disability discrimination."

We agree with the trial court's analysis with respect to the first two prongs of the *McDonnell Douglas* test—i.e., that Moore sufficiently demonstrated a prima facie case of discrimination, and that Defendant offered evidence of a legitimate, nondiscriminatory basis for Moore's termination.[4]  However, we conclude that there remain triable issues of

---

[4]  We agree with the trial court that the evidence presented on summary judgment is sufficient to demonstrate that Moore can meet her burden to present a prima facie case of discrimination based on a perceived disability.  Under FEHA, a person is considered "physically disabled" not only if he or she has a physiological condition that "[l]imits a major life activity" (§ 12926, subd. (m)(1)(B)), but also if he or she is "*regarded or treated by the employer* . . . as having, or having had, any physical condition that [currently] makes [or, in the future may make] achievement of a major life activity difficult." (*Id.*, subd. (m)(4), (5), italics added.)

19

fact regarding pretext in the face of Defendant's proffer of a nondiscriminatory reason for Moore's termination.[5]

Once an employer has offered a legitimate, nondiscriminatory reason for the adverse employment action, a " 'plaintiff must offer evidence that the employer's stated reason is either false or pretextual, or evidence that the employer acted with discriminatory animus, or evidence of each which would permit a reasonable trier of fact to conclude the employer intentionally discriminated.' " (*Faust*, *supra*, 150 Cal.App.4th at p. 886.)

Subdivisions (m)(4) and (5) implement the Legislature's intent to protect individuals who are "erroneously or mistakenly believed to have any physical or mental condition that limits a major life activity." (§ 12926.1, subd. (d).) "Both the policy and language of the statute offer protection to a person who is not actually disabled, but is wrongly perceived to be." (*Gelfo v. Lockheed Martin Corp*. (2006) 140 Cal.App.4th 34, 53.)

On appeal, Moore focuses her briefing on her claim for discrimination based on what she alleges was her perceived disability, asserting that this "is a classic perceived disability case." However, Moore also suggests in a footnote that she suffers from an *actual* disability, as well—i.e., heart disease. Moore makes only a brief assertion in this footnote that she "had an actual disability" because " 'physical disabilities' " includes " 'heart disease.' " We do not address this contention on appeal because Moore's reference to her having an actual disability in a footnote is insufficient to raise a challenge to the trial court's determination, on summary judgment, that the undisputed facts demonstrate that Moore did not have an actual disability at the relevant time. (See *Niko v. Foreman* (2006) 144 Cal.App.4th 344, 368 ["One cannot simply say the court erred, and leave it up to the appellate court to figure out why"]; see also *Strutt v. Ontario Sav. & Loan Assn*. (1972) 28 Cal.App.3d 866, 873 ["An appellate court is not required to consider alleged errors where the appellant merely complains of them without pertinent argument"].)

5      Because this is an appeal from a grant of a motion for summary judgment, we must view the evidence in the light most favorable to Moore, the nonmoving party. We do not intend to suggest that, at trial, a fact finder *should or will* weigh this evidence and draw the same inferences that we raise in this opinion. Rather, we simply conclude that a fact finder *could* reasonably draw such inferences. The same is true with respect to our conclusions as to Moore's other FEHA and CFRA claims.

Moore offered evidence that Defendant's proffered reasons for terminating her employment may have been untrue, as well as evidence that suggested that Kennedy may not have believed that Moore was healthy enough to continue in her position with the typical stressors of her job—evidence from which a fact finder could infer that Defendant's proffered reason was a pretext for disability discrimination.

Defendant maintains that Moore was laid off due to a restructuring or reorganization of the Department. According to Kennedy, the duties that Moore had in her position were duplicative of duties that Kennedy either was handling or planned to handle herself. However, the timing of events leading up to Moore's termination could suggest that something other than simple restructuring was at play.

Moore was originally hired into the Department as a temporary worker in October 2008, and within a year she was promoted to the position of Creative Director, a permanent position. By February 2010, just over a year after she had been hired as a temporary worker, Moore was promoted to the position of Director of Marketing, a position in which she oversaw half of the Department. After the Executive Director resigned unexpectedly around that same time, Moore and another Director shared interim Executive Director duties. Despite Moore's otherwise rapid ascension in the Department, later that year, specifically, after September 10, 2010, when Moore began wearing the "LifeVest" at work, Kennedy began *eliminating* Moore's "main responsibilities," including her work on an "open enrollment program and advertising." Kennedy also began overseeing the advertising herself. Kennedy had started "sending work to freelancers," including work that had previously been done internally, and then "took

21

[Moore] off of overseeing the freelancers."  This all occurred after Moore informed Kennedy of her heart condition but expressly declined to request any differential treatment or accommodation, and after Kennedy replied, " 'The first thing we need to do is lighten your load to get rid of some of the stress.' "

Then, approximately a year after Moore had been promoted to a Director position, but only two months after Moore informed Kennedy that she would need some time off for a surgery related to her heart condition, Kennedy decided to eliminate Moore's position.  Rather than move Moore to a different Director position or even demote her but keep her employed in the Department, Kennedy terminated Moore's employment altogether.  "Pretext may . . . be inferred from the timing of the company's termination decision, by the identity of the person making the decision, and by the terminated employee's job performance before termination."  (*Flait v. North American Watch Corp.* (1992) 3 Cal.App.4th 467, 479.)

A defendant's failure to follow its own policies or procedures may also provide evidence of pretext.  (See *Village of Arlington Heights v. Metropolitan Housing Development Corp.* (1977) 429 U.S. 252, 267 [a departure from normal procedures "might afford evidence that improper purposes [played] a role" in an employee's termination].)  The record discloses evidence from which a reasonable fact finder could conclude that Kennedy failed to follow Defendant's stated procedures with respect to layoffs occurring during a restructuring when she not only eliminated Moore's position, but terminated Moore's employment.

Specifically, Defendant had a policy to retain employees in the same unit, classification and salary grade based on seniority, unless a particular employee who was less senior possessed "special skills, knowledge, or abilities" that a more senior employee did not. At the time Kennedy decided to terminate Moore, Moore was senior to Shea, and they both "f[e]ll in the same payroll, title, and the same classification." When asked by a representative of the Human Resources Department why Kennedy was not adhering to the stated seniority policy with respect to Moore, Kennedy explained the reasons for the elimination of Moore's *position*, but provided no information regarding her assessment with respect to any "special skills, knowledge, or abilities" that Shea possessed and Moore did not. In other words, Kennedy did not provide any reason why *Shea*, in particular, was being retained over *Moore*, who had more seniority; instead, Kennedy explained the reason for the elimination of Moore's "Director" position—i.e., that "[t]here is no need for two director level positions in the marketing area. [Deb Moore and Karen Shea]" and that there was a duplication of duties with Kennedy's position and Moore's position.

Further, in her declaration submitted in support of Defendant's motion for summary judgment, Kennedy's explanation for the decision to retain Shea rather than Moore was that "the two directors oversaw different functions and the roles were not interchangeable." Kennedy still provides no explanation, however, as to whether Shea possessed "special skills, knowledge, or abilities" that Moore did not, that would merit Shea's retention in lieu of Moore's, which is what Defendant's stated policy requires. Indeed, Kennedy acknowledged during her deposition that Moore "probably" had the

23

ability to fill the role that Shea had been in for only a few months when Moore was terminated.

Further, there is evidence demonstrating that Kennedy also did not adhere to Defendant's policy to " '[g]ive regular status employees preferential opportunities for reassignment or transfer prior to indefinite layoff,' " or Defendant's policy regarding the "right to recall." Kennedy admitted that she did not ask Moore if she would accept a pay reduction, did not offer Moore any of the positions that were filled around or after her termination, and did not consider Moore for a freelance position. This was in spite of the fact that between November 2010 and May 2011, the Department increased its headcount by eight employees, that the most significant increases in staff were in the internet marketing and design and production areas, and that Kennedy was aware that Moore had a background in design and production.

Thus, there remain significant questions as to whether Defendant followed its own stated policies with respect to Moore's termination.

In addition to the evidence that raises questions about Defendant's proffered reasons for terminating Moore's employment, Moore provided evidence of other statements made by Kennedy from which a fact finder could infer that Kennedy was concerned that Moore's health was going to be a problem at work and that she may have had discriminatory reason for terminating Moore's employment. After observing Moore wearing the "LifeVest" and learning from Moore about Moore's heart condition, Kennedy contacted the Human Resources Department and inquired as to what she should do about employees " 'with *adverse* health issues' " (italics added), in the context of inquiring with

24

respect to Moore's "*adverse* health condition" (italics added).  Even more troubling is evidence that when Moore informed Kennedy that she no longer needed to wear the "LifeVest," Kennedy's response was that she had "been in touch with HR" to ask "how to handle [Moore] *as a liability to the department*."  (Italics added.)  The reference to Moore being a "liability to the department" with respect to her heart condition could reasonably be viewed by a fact finder as evidence of a discriminatory animus toward Moore's perceived disability.[6]

The fact that the parties dispute a number of factual issues, including whether Moore was equipped to perform the functions of Shea's position, whether Kennedy did or did not follow Defendant's own policies for laying off employees, and whether Kennedy perceived Moore as having a disability, demonstrates why this case is not an appropriate one for summary judgment and instead, should be heard by a jury.  There is evidence supporting both parties' positions, and it is not up to the court to weigh conflicting evidence or to assess the credibility of witnesses.  Rather, the court's duty is to determine only whether the evidence could support a judgment in favor of the nonmoving party.  Here, the evidence is such that a reasonable fact finder could conclude that Defendant's proffered reasons for terminating Moore's employment were unworthy of credence and that Kennedy believed that Moore was a "liability" to the Department as a result of her

---

[6]     Again, we reassert that we do not intend to suggest that Kennedy did, in fact, harbor a discriminatory animus toward Moore based on her perceived disability, or that a fact finder would necessarily agree that Kennedy harbored such animus.  Rather, we are simply saying that based on this evidence one could reasonably conclude that such animus existed.

25

heart condition, and, based on that conclusion, could infer that the proffered reasons for Moore's termination were not the real reasons for the termination. In other words, a reasonable juror could find that Defendant's stated reason for terminating Moore was pretextual, and that Defendant was instead motivated by a discriminatory purpose. Again, issues of intent and motive are typically *not* appropriate for disposition on summary judgment. (*Nazir*, *supra*, 178 Cal.App.4th at p. 286.) We therefore conclude that summary judgment with respect to Moore's first cause of action for disability discrimination in violation of FEHA must be reversed.

C. *Moore's second and third causes of action for failure to accommodate and failure to engage in the interactive process in violation of FEHA*

In addition to setting forth a general prohibition against unlawful employment discrimination based on disability, FEHA provides an independent cause of action for an employer's failure to provide a reasonable accommodation for an applicant's or employee's known disability. (§ 12940, subds. (a), (m).) "Under the express provisions of the FEHA, the employer's failure to reasonably accommodate a disabled individual is a violation of the statute in and of itself." (*Jensen*, *supra*, 85 Cal.App.4th at p. 256; *Bagatti v. Department of Rehabilitation* (2002) 97 Cal.App.4th 344, 357.) Similar reasoning applies to violations of section 12940, subdivision (n), for an employer's failure to engage in a good faith interactive process to determine an effective accommodation, once one is requested. (*Ibid.*; *Claudio v. Regents of University of California* (2005) 134 Cal.App.4th 224, 243.)

26

Two principles underlie a cause of action for failure to provide a reasonable accommodation. First, the employee must request an accommodation. (*Prilliman v. United Air Lines, Inc.* (1997) 53 Cal.App.4th 935, 954.) Second, the parties must engage in an interactive process regarding the requested accommodation and, if the process fails, responsibility for the failure rests with the party who failed to participate in good faith. (See *Jensen*, *supra*, 85 Cal.App.4th at p. 266.) While a claim of failure to accommodate is independent of a cause of action for failure to engage in an interactive dialogue, each necessarily implicates the other. (*Gelfo v. Lockheed Martin Corp.* (2006) 140 Cal.App.4th 34, 54 (*Gelfo*).)

The trial court concluded that Moore cannot prevail on her accommodation claim or her claim for failure to engage in the interactive process because "she did not have a disability that required accommodation." This, however, is not a basis for rejecting a plaintiff's failure to accommodate and/or failure to engage in the interactive process claim(s): "[E]mployers must reasonably accommodate individuals falling within any of FEHA's statutorily defined 'disabilities,' *including those 'regarded as' disabled*, and must engage in an informal, interactive process to determine any effective accommodations." (*Gelfo*, *supra*, 140 Cal.App.4th at p. 55, italics added.)

In discussing its conclusion that an employer may be held liable for failing to accommodate an individual whom the employer perceives as disabled, even if he or she is not actually disabled under FEHA, the *Gelfo* court adopted similar reasoning employed by a federal court in considering this issue with respect to the ADA:

27

" 'The ADA is concerned with safeguarding the employees' livelihood from adverse actions taken on the basis of "stereotypic assumptions not truly indicative of individual ability" of the employee. . . . [T]he real danger is not that the employee will fail to educate an employer concerning her abilities, but that "[t]he employee whose limitations are perceived accurately gets to work, while [the employee perceived as disabled] is sent home unpaid." ' [Citations.] Stated differently, the ADA's educational function is actually advanced by providing accommodations to 'regarded as' disabled employees because '*an employer who is unable or unwilling to shed his or her stereotypic assumptions based on a faulty or prejudiced perception of an employee's abilities must be prepared to accommodate the artificial limitations created by his or her own faulty perceptions*. In this sense, the ADA encourages employers to become more enlightened about their employees' capabilities, while protecting employees from employers whose attitudes remain mired in prejudice.' [Citation.] Finally, *Kelly* noted that, by failing to make any definitional distinction between an employee who was actually disabled and one who was merely regarded as disabled, Congress did not consider it inherently unreasonable to provide an accommodation for an employee whom an employer only regarded as disabled." (*Gelfo*, *supra*, 140 Cal.App.4th at p. 59, first italics added, second italics in original, quoting *Kelly v. Metallics West, Inc.* (10th Cir. 2005) 410 F.3d 670, 675-676.)

Consequently, the trial court erroneously relied on its conclusion that Moore did not have a disability in granting summary adjudication of Moore's claims for failure to accommodate and failure to engage in the interactive process, since a plaintiff need not have an actual disability, but need only be regarded by the employer as having one, to be able to make out claims under section 12940, subdivisions (m) and (n).

The trial court also concluded, in the alternative, that Moore was "not denied an accommodation" because she was terminated prior to any denial of her request for time off for her surgery. However, as the trial court concluded, Moore made out a prima facie case that Defendant regarded her as disabled with respect to her heart condition. Moore

28

informed Kennedy that she would have to take some time off in order to have surgery related to the condition for which there is evidence that she was regarded as disabled. A term of leave from work can be a reasonable accommodation under FEHA (*Hanson v. Lucky Stores, Inc.* (1999) 74 Cal.App.4th 215, 226), and, therefore, a request for leave can be considered to be a request for accommodation under FEHA. There was no evidence presented with respect to Defendant's motion for summary judgment that Kennedy or anyone else engaged in an interactive process with Moore to discuss her request for leave. The evidence establishes, however, that Moore was terminated before she was granted leave for her surgery.

As we have already concluded, there is sufficient evidence of pretext in Moore's termination to make summary adjudication of Moore's discrimination claim inappropriate, and, thus, the termination cannot support the conclusion that Defendant did not have to address Moore's request for accommodation or engage in an interactive process with Moore. " 'In a practical sense,' as another court observed in the ADA context, 'the interactive process is more of a labor tool than a legal tool, and *is a prophylactic means to guard against capable employees losing their jobs even if they are not actually disabled*.' " (*Gelfo*, *supra*, 140 Cal.App.4th at pp. 61-62, italics added.) The point of the interactive process is to find reasonable accommodation for a disabled employee, or an employee regarded as disabled by the employer, in order to *avoid* the employee's termination. Therefore, a pretextual termination of a perceived-as-disabled employee's employment in lieu of providing reasonable accommodation or engaging in

29

the interactive process does not provide an employer a reprieve from claims for failure to accommodate and failure to engage in the interactive process.

A reasonable fact finder could conclude, based on the evidence presented on summary judgment, (1) that Defendant regarded Moore as disabled, (2) that Moore requested an accommodation of leave to have surgery related to her perceived disability, (3) that Defendant terminated Moore before either providing her with the requested accommodation or engaging with her further to determine whether such accommodation would sufficiently address her perceived disability or whether other or different accommodations might reasonably be provided, and (4) that the termination was pretextual. The granting of summary adjudication of Moore's second and third causes of action in favor of Defendant was therefore erroneous.

D.      *Moore's fourth cause of action for retaliation in violation of FEHA*

Moore's fourth cause of action alleges a violation of section 12940, subdivision (h), which prohibits employer retaliation against an employee as a result of the employee engaging in certain protected conduct. Specifically, section 12940, subdivision (h) makes it unlawful for an employer "to discharge, expel, or otherwise discriminate against any person because *the person has opposed any practices forbidden under this part* or because *the person has filed a complaint, testified, or assisted in any proceeding under this part*." (Italics added.) In order to establish a prima facie case of retaliation under this section, "a plaintiff must show (1) he or she engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action." (*Yanowitz v. L'Oreal*

30

*USA, Inc.* (2005) 36 Cal.4th 1028, 1042.)  If any employee presents a prima facie case of retaliation, the court then employs the three-stage *McDonnell Douglas* burden shifting analysis to the employee's claim.  (*Ibid.*)

In the operative complaint, Moore alleges that Defendant unlawfully retaliated against her as a result of her "notifying" Defendant "of her disability(ies) and need for accommodations, including, but not limited to, a finite leave of absence."  In other words, Moore contends that the "protected activity" in which she engaged was notifying Defendant of her heart condition and requesting a leave of absence for her surgery.

The trial court concluded that Defendant was entitled to summary adjudication of Moore's cause of action for retaliation under subdivision (h) of section 12940 on the ground that "[m]erely requesting an accommodation is not a protected activity" under subdivision (h).  The trial court relied, in part, on *Rope v. Auto-Chlor System of Washington, Inc.* (2013) 220 Cal.App.4th 635, 652 (*Rope*) in reaching this conclusion.  In *Rope*, the court determined that there was "no support in the regulations or case law for the proposition that a mere request—or even repeated requests—for an accommodation, without more, constitutes a protected activity sufficient to support a claim for retaliation in violation of FEHA."  (*Id.* at p. 652.)  Rather, "case law and FEHA's implementing regulations are uniformly premised on the principle that the nature of activities protected by section 12940, subdivision (h) demonstrate *some degree of opposition to or protest of the employer's conduct or practices* based on the employee's reasonable belief that the employer's action or practice is unlawful.  (See Cal. Code. Regs., tit. 2, former § 7287.8; *Gardner v. City of Berkeley* (N.D.Cal. 2012) 838 F.Supp.2d 910, 925 [mere 'act of

31

receiving a medical retirement is not a "protected activity . . ." ' under FEHA].)" (*Id.* at

pp. 652-653.)

On appeal, however, Moore contends that Defendant does not "raise any

arguments against the first two elements [of her prima facie case of retaliation], nor does

[Defendant] discuss the fact that the Legislature amended FEHA to supersede *Rope*[,

*supra*,] 220 Cal.App.4th 365 and make clear that a request for an accommodation

constitutes protected activity."[7]

In 2015, the Legislature amended section 12940 by adding two provisions; A.B.

987 "enact[s] paragraph (2) of subdivision (m) and paragraph (4) of subdivision (l) of

Section 12940, to provide protection against retaliation when an individual makes a

request for reasonable accommodation under these sections, regardless of whether the

request was granted." (A.B. 987, § 1, subd. (d).)  Relevant to Moore's claims for

disability discrimination is the amendment to subdivision (m) of section 12940.[8]  As

newly amended, effective January 1, 2016, the provision currently makes it unlawful:

> "(m)*(1)* For an employer or other entity covered by this part to fail to
> make reasonable accommodation for the known physical or mental
> disability of an applicant or employee.  Nothing in this subdivision
> or in paragraph (1) or (2) of subdivision (a) shall be construed to
> require an accommodation that is demonstrated by the employer or

---

7    Moore filed a request for judicial notice in this court, seeking notice of Assembly
Bill No. 987, Stats. 2015, chapter 122, section 2, effective January 1, 2016 (A.B. 987).
Defendant has not filed any opposition to Moore's request for judicial notice.  Given that
the subject of the request meets the requirements for judicial notice under Evidence Code
section 452, we grant Moore's request for judicial notice of this statutory amendment.

8    Subdivision (m) of section 12940 refers to accommodation for physical or mental
disabilities, while subdivision (*l*) refers to accommodation for religion.

32

other covered entity to produce undue hardship, as defined in subdivision (u) of Section 12926, to its operation.

"*(2) For an employer or other entity covered by this part to, in addition to the employee protections provided pursuant to subdivision (h), retaliate or otherwise discriminate against a person for requesting accommodation under this subdivision, regardless of whether the request was granted.*"  (§ 12940, italics added to demonstrate newly added language.)

A question arises as a result of the Legislature's act in amending section 12940: Does the recent amendment have an effect on Moore's claim for retaliation under FEHA, in which she alleges a violation of law that occurred in early 2011?

"Generally, statutes operate prospectively only."  (*Myers v. Philip Morris Companies, Inc.* (2002) 28 Cal.4th 828, 840.)  Statutes operate prospectively unless they contain an express retroactivity provision, or it is " '*very clear*' " that the Legislature intended the statute to operate retroactively.  (*Id.* at p. 841.)  In this case, A.B. 987 does not contain an express retroactivity provision, and there is nothing else that we have found that would make it very clear that the Legislature intended for the change it evidences to apply retroactively.

However, " '[a] statute that merely *clarifies*, rather than changes, existing law does not operate retrospectively even if applied to transactions predating its enactment' 'because the true meaning of the statute remains the same.' "  (*McClung v. Employment Development Dept.* (2004) 34 Cal.4th 467, 471-472.)  Courts, not the legislature, determine whether a statue is "merely" clarifying, rather than changing existing law.  (See *id.* at p. 472.)  Thus, when the Supreme Court has "finally and definitively" interpreted a statute, the Legislature is without power to state that a later amendment is simply

declarative of existing law if the declaration of that existing law is contrary to the Supreme Court's interpretation. (*Carter v. California Dept. of Veterans Affairs* (2006) 38 Cal.4th 914, 922.) However, if the Supreme Court has not provided a final and definitive interpretation of the relevant statute at the time the Legislature states that a later amendment is declarative of existing law, then courts interpreting the statute must give the Legislature's views consideration. (*Ibid.*)

"A court engaged in statutory construction looks to 'all pertinent circumstances and considerations in deciding whether an amendment is a modification or clarification of a statute.' [Citation.] And particularly when there is no definitive 'clarifying' expression by the Legislature in the amendments themselves, we will presume that a substantial or material statutory change . . . bespeaks legislative intention to change, and not just clarify, the law." (*Fonseca v. City of Gilroy* (2007) 148 Cal.App.4th 1174, 1197.) By this standard, the preamble to the amendments contained in A.B. 987, as well as the amendments themselves, are insufficient to show a legislative intent to clarify, as opposed to change, the law. There is no statement in the legislation that the Legislature was simply "clarifying" what conduct constitutes "protected activity" for purposes of the retaliation provision in subdivision (h) of section 12940. In addition, the Legislature's preamble to the amendment suggests that the change is intended to apply prospectively, by stating that despite the opinion in *Rope*, the Legislature "intends . . . to provide protection against retaliation when an individual makes a request for reasonable accommodation under [subdivisions (*l*) and (m)], regardless of whether the request was granted" by its enactment of the two new paragraphs. (A.B. 987, § 1, subd. (d).) There

34

would be no need to provide protection against retaliation by enacting additional provisions if the Legislature believed that such protection had always been provided under the law as it stood prior to the amendment. Further, the Legislature made no change to subdivision (h), the retaliation provision, itself. Rather, the Legislature chose to add new language to the subdivisions addressing accommodations for disabilities and religion. (See § 12940, subds. (*l*) & (m).) We therefore presume that in passing A.B. 987, the Legislature intended to *change* the law, not clarify it. Thus, the amendment to section 12940 enacted through A.B. 987 operates prospectively.

Because the recent amendment is prospective in application, in 2011, at the time Moore alleges Defendant engaged in the asserted retaliation, the law was consistent with the holding of *Rope*, *supra*, 220 Cal.App.4th 635. In other words, at the time of the relevant events, a request for an accommodation, without more, was insufficient to constitute "protected activity" under section 12940, subdivision (h), and such activity thus could not support a claim for retaliation under subdivision (h). (*Rope*, *supra*, at p. 652.) As a result, Moore cannot base her claim for retaliation under FEHA on her alleged request for an accommodation—i.e., her request for time off for surgery.

In addition, there is no legal support for Moore's contention that her FEHA retaliation claim can be based on her "notifying the University of her heart condition." In essence, Moore asserts that she engaged in "protected activity" by simply notifying Kennedy that she had a heart condition. Notifying one's employer of one's medical status, even if such medical status constitutes a "disability" under FEHA, does not fall within the protected activity identified in subdivision (h) of section 12940—i.e., it does

35

not constitute engaging in opposition to any practices forbidden under FEHA or the filing of a complaint, testifying, or assisting in any proceeding under FEHA. Moore has offered no authority to support her contention that an employee's notifying his or her employer of a medical issue that may be a disability under the statute constitutes "protected activity" on which a FEHA retaliation claim may rest.

We therefore conclude that no issues of material fact remain in dispute with respect to Moore's FEHA retaliation claim, and that summary adjudication of this claim in favor of Defendant was appropriate.

E.     *Moore's sixth cause of action for retaliation in violation of CFRA*

The elements of a cause of action for retaliation in violation of CFRA are: " '(1) the defendant was an employer covered by CFRA; (2) the plaintiff was an employee eligible to take CFRA [leave]; (3) the plaintiff exercised her right to take [leave] for a qualifying CFRA purpose; and (4) the plaintiff suffered an adverse employment action, such as termination, fine, or suspension, because of her exercise of her right to CFRA [leave].' " (*Faust*, *supra*,150 Cal.App.4th at p. 885.)  Similar to causes of action under FEHA, the *McDonnell Douglas* burden shifting analysis applies to retaliation claims under CFRA.  (*Faust*, *supra*, at p. 885.)

Defendant asserts that the trial court correctly concluded that it was entitled to judgment on Moore's CFRA retaliation cause of action because "[Moore] did not exercise

her right to take CFRA leave and she cannot establish a causal connection [between the exercise of such right and an adverse employment action]."[9]

Defendant is incorrect with respect to the state of the evidence regarding the element that the plaintiff " 'exercised her right to take [leave] for a qualifying CFRA purpose.' " (*Faust*, *supra*,150 Cal.App.4th at p. 885.) Defendant asserts that Moore "testified she never used, or intended to use, a protected leave during her employment." This, however, is insufficient to demonstrate that Moore did not "exercise[ ] her right to take [leave] for a qualifying CFRA purpose." (*Ibid.*) The relevant question with respect to this element is not whether a plaintiff expressly requested *CFRA* leave, but, rather, whether a plaintiff "exercised *her right to take* [*leave*]" and whether the purpose for the leave sought was a "qualifying CFRA purpose." (*Faust*, *supra*, at p. 885, italics added.) A review of the implementing regulations for CFRA demonstrates Defendant's error with respect to this element of a CFRA retaliation claim.

Section 12945.2, subdivision (a), provides that the Fair Employment and Housing Commission "shall adopt a regulation specifying the elements of a reasonable request" for leave under the CFRA. California Code of Regulations, title 2, section 11088,

---

9       Defendant also contends that Moore "abandoned this cause of action at the trial court level" because, Defendant asserts, she "failed to address this claim entirely in her opposition brief." We disagree. Although Moore did not specify that she was addressing her CFRA retaliation claim in her opposition to Defendant's motion for summary judgment, Moore discussed the relevant authority and supporting evidence in the record in a manner that sufficiently demonstrates that summary adjudication of this claim was inappropriate. We therefore address the propriety of the trial court's granting of summary adjudication in favor of Defendant on this cause of action.

subdivision (b)(2) provides: "A request to take a CFRA leave is reasonable if it complies with any applicable notice requirements, as specified in section 11091 . . . ."

In turn, California Code of Regulations, title 2, section 11091, subdivision (a)(1) describes the notice requirements of a reasonable request for CFRA leave in relevant part as follows: "[A]n employee shall provide at least verbal notice sufficient to make the employer aware that the employee needs CFRA leave, and the anticipated timing and duration of the leave. *The employee need not expressly assert rights under CFRA or FMLA*, *or even mention CFRA or FMLA*, *to meet the notice requirement*; however, the employee must state the reason the leave is needed, such as, for example, the expected birth of a child or for medical treatment. *The mere mention of 'vacation,' other paid time off*, *or resignation does not render the notice insufficient*, provided the underlying reason for the request is CFRA-qualifying, and the employee communicates that reason to the employer. The employer should inquire further of the employee if necessary to determine whether the employee is requesting CFRA leave and to obtain necessary information concerning the leave (i.e., commencement date, expected duration, and other permissible information)." (Italics added.) Thus, an employer bears a burden, under CFRA, to inquire further if an employee presents the employer with a CFRA-qualifying reason for requesting leave.

There is evidence that Moore informed Kennedy that she would have to take leave for surgery for implantation of a device for her heart condition.[10] Defendant has presented no evidence to dispute that Moore's reason for the requested time off was CFRA-qualifying. (See § 12945.2, subd. (c)(8) [A "[s]erious health condition" under CFRA includes "an illness, injury, impairment, or physical or mental condition that involves . . . [¶] (A) Inpatient care in a hospital, hospice, or residential health care facility. [¶] (B) Continuing treatment or continuing supervision by a health care provider"].) The facts presented with respect to the motion for summary judgment support the conclusion that Moore provided sufficient notice to make Defendant aware of her need to take CFRA-qualifying leave; at a minimum, there remains a question as to whether Moore's notification to Kennedy of her need to take leave for surgery for implantation of a device for her heart condition constituted the "exercise[ ]" of "her right to take leave for a qualifying CFRA purpose." (*Faust*, *supra*, 150 Cal.App.4th at p. 885.) Defendant, therefore, has not established that Moore *cannot* meet this element of her prima facie case.

Defendant also contends that because it offered a legitimate, nonretaliatory reason for Moore's layoff, Moore cannot demonstrate pretext, as a matter of law. As we have explained in part III.B., *ante*, however, we disagree that the question of pretext with respect to Moore's termination is appropriate for determination *as a matter of law* on this

---

10    Again, Moore informed Kennedy in December 2010 of the likelihood that she would have to have a device implanted near her heart in early 2011, and told Kennedy in January 2011 that she "would need 'like two or three' days off in April 2011" for the surgery.

record.  We refer to our discussion of the evidence in part III.B., *ante*, with respect to the question of pretext.

Given that there remain material issues of fact in dispute regarding whether Defendant's proffered reason for Moore's termination was pretextual, Defendant has not sufficiently demonstrated that it is entitled to summary adjudication of Moore's claim for unlawful retaliation under CFRA.

F.     *Moore's fifth cause of action for interference with CFRA*

In her fifth cause of action, Moore asserts a claim for interference with CFRA. CFRA makes it unlawful for an employer "to interfere with, restrain, or deny the exercise of, or the attempt to exercise, any right" provided by CFRA.  (§ 12945.2, subd. (t).)  An interference claim under CFRA does not invoke the burden-shifting analysis of the *McDonnell Douglas* test.  (*Faust*, *supra*, 150 Cal.App.4th at p. 879; see also *Bachelder v. America West Airlines, Inc.* (9th Cir. 2001) 259 F.3d 1112, 1131 ["there is no room for a *McDonnell Douglas* type of pretext analysis when evaluating an 'interference' claim under [the corresponding FMLA] statute"].)  Rather, such a claim requires only that the employer deny the employee's entitlement to CFRA-qualifying leave.  (*Faust*, *supra*, at p. 879.)  A CFRA interference claim "consists of the following elements:  1) the employee's entitlement to CFRA leave rights; and (2) the employer's interference with or denial of those rights."  (*McClain v. Cenveo Corp*. (E.D.Cal., Sept. 16, 2013, 2:12-CV-00765-GEB-GGH) 2013 U.S.Dist. Lexis 132264, p. *21.)

Moore contends that she requested leave for a CFRA-qualified reason—i.e., heart surgery—and that instead of notifying Moore of her right to take CFRA-qualified leave

40

and thereafter allowing her to take such leave, Defendant effectively interfered with her ability to take CFRA protected leave by terminating her employment. As we have already concluded in part III.F., there remains, at a minimum, a question as to whether Moore's notification to Kennedy of her need to take leave for surgery for implantation of a device for her heart condition provided Defendant with sufficient notice of her need to take CFRA-qualifying leave. The fact that Moore may not have used the term "CFRA" in requesting leave, or that she may have suggested that she would use available paid time off options, does not, in and of itself, render Moore's notice ineffective. (See Cal. Code Regs., tit. 2, § 11091, subd. (a)(1) ["The mere mention of 'vacation,' other paid time off, or resignation does not render the notice insufficient, provided the underlying reason for the request is CFRA-qualifying, and the employee communicates that reason to the employer"].) Further, contrary to Defendant's position, the evidence does not establish that Moore's intent was to make an affirmative election *not* to use CFRA-protected leave. Specifically, Moore's testimony, on which Defendant relied in asserting that Moore did not "exercise her rights to take a CFRA leave" (formatting omitted), was not that she had affirmatively decided *not* to seek CFRA-protected leave.[11]

---

[11] Moore's testimony, on which Defendant relied in seeking summary adjudication of this claim, was *not* that she did not wish to take CFRA protected leave. Rather, in the portion of Moore's deposition on which Defendant relies to support its "[u]ndisputed [m]aterial [f]act" (boldface & underscore omitted) that Moore "intended to use her accrued vacation or sick time," and to suggest that she did not intend to use CFRA-protected leave, Moore was asked whether she had completed *FMLA paperwork*, which Moore had obtained from Human Resources. Moore responded that she had not completed it, and that when she took it to her doctor, her doctor told her, " 'You're not going to need to take this.' " Moore was then asked whether it was her "understanding

Defendant's reliance on *Escriba v. Foster Poultry Farms, Inc.* (9th Cir. 2014) 743 F.3d 1236, 1244 (*Escriba*), is misplaced. In fact, *Escriba*, which involved claims under the FMLA, supports our conclusion that summary adjudication of Moore's CFRA interference claim was not appropriate. The *Escriba* court held that "an employee can affirmatively decline to use FMLA leave, even if the underlying reason for seeking the leave would have invoked FMLA protection." (*Escriba*, *supra*, at p. 1244.) In *Escriba*, which involved an appeal after a jury verdict, not a summary judgment, the court determined that sufficient evidence supported the jury's conclusion that the plaintiff had "elected not to take FMLA leave." (*Id.* at pp. 1239, 1245.) The issue before the jury was Escriba's *intent* at the time she requested a two-week leave. In concluding that there was sufficient evidence to support the jury's conclusion on this issue, the *Escriba* court relied on numerous reasonable inferences that the jury could have drawn based on Escriba's handling of this leave request and her use of FMLA leave on multiple prior occasions:

> "Circumstantial evidence also suggests that Escriba knew that the Human Resources Department, not her supervisors, approved FMLA leave because Escriba had successfully requested FMLA leave on *fifteen* prior occasions. A reasonable inference from this evidence is that, if Escriba had desired to take FMLA leave, she would have arranged for such leave with Human Resources. Considering all the evidence, the jury reasonably found that Escriba expressed a desire *not* to take FMLA leave." (*Escriba*, *supra*, at p. 1245.)

---

that [she] didn't need to take it because [she was] only taking a few days off," which Moore confirmed, and further confirmed that she thought she "could use [her] vacation or sick time for that." This evidence could lead to a number of reasonable inferences, but it does not establish, as a matter of law, that Moore had affirmatively elected not to utilize CFRA-protected leave for her surgery. A fact finder could conclude that Moore had not even been made aware of her right to use CFRA-protected leave, and, therefore, that she could not have affirmatively elected *not* to use it.

42

The evidence presented on summary judgment in this case is easily distinguishable from the evidence presented to the jury in *Escriba*.  Unlike in *Escriba*, there is no evidence that Moore had ever requested FMLA or CFRA leave prior to the time she indicated she would need to take a few days off for her surgery.  Further, there is no evidence that Moore was aware of her right to take CFRA leave (as opposed to FMLA leave); if Moore did not even realize that she had a right to such leave, a fact finder could conclude that she did not affirmatively decline to use such leave.  Further, when Moore first provided notice to Kennedy of her need for leave, the surgery was many months away; even at the time Moore was terminated, there was approximately a month and a half to go before her planned April 2011 surgery.  Thus, it is possible that Moore had not yet made a firm decision as to whether to take vacation leave or legally-protected medical leave.  Therefore, even if one were to conclude that Moore was actually aware of her right to take CFRA-protected leave, a fact finder could nevertheless also reasonably conclude from the evidence presented on summary judgment that Moore had formed no specific intent with respect to seeking CFRA leave (i.e., she had not formed an intent *not* to take CFRA leave).

Further, Defendant fails to acknowledge that summary adjudication of an interference claim under CFRA may not be appropriate where, as here, the record fails to establish—as a matter of law—that the employer satisfied a threshold requirement of its obligations to an employee under CFRA.  (See *Faust*, *supra*, 150 Cal.App.4th at p. 868.)  Employers subject to the CFRA are required to provide notice to their employees of the right to request CFRA leave.  (Cal. Code Regs., tit. 2, § 11095, subd. (a).)  The text of the

43

minimum notice requirements is set forth at California Code of Regulations, title 2, section 11095, subdivision (d).[12] When an employee raises a CFRA interference claim, there is a "threshold issue of an *employer's* obligations under section 12945.2 and the implementing regulations," and whether the employer met those obligations. (*Faust*, *supra*, at p. 881.) This is because "[a] failure to notify an employee of his rights under FMLA [and thus CFRA] can constitute interference if it affects [the employee's] rights under [the statute]." (*Alcala v. Best Buy Stores, LP* (C.D. Cal., Nov. 7, 2012, EDCV 11-00798-JVS-(OPx)) 2012 U.S.Dist. Lexis 181892, p. *43.)

---

[12] The text of the notice set forth in California Code of Regulations, title 2, section 11095, subdivision (d), states in relevant part: "Under the California Family Rights Act of 1993 (CFRA), if you have more than 12 months of service with us and have worked at least 1,250 hours in the 12-month period before the date you want to begin your leave, you may have a right to a family care or medical leave (CFRA leave). This leave may be up to 12 workweeks in a 12-month period for the birth, adoption, or foster care placement of your child or for your own serious health condition or that of your child, parent or spouse. [¶] . . . [¶] If possible, you must provide at least 30 days' advance notice for foreseeable events (such as the expected birth of a child or a planned medical treatment for yourself or of a family member). For events which are unforeseeable, we need you to notify us, at least verbally, as soon as you learn of the need for the leave. Failure to comply with these notice rules is grounds for, and may result in, deferral of the requested leave until you comply with this notice policy. [¶] We may require certification from your health care provider before allowing you a leave for pregnancy disability or your own serious health condition. We also may require certification from the health care provider of your child, parent or spouse who has a serious health condition, before allowing you a leave to take care of that family member. When medically necessary, leave may be taken on an intermittent or reduced work schedule."

There is nothing in the separate statements of undisputed facts that would indicate that Defendant either posted notice or specifically provided notice to Moore of her leave rights *under CFRA*, as specifically required by CFRA.[13] In *Faust*, the employer's failure to establish that it met its CFRA notice obligations precluded summary adjudication of the employee's CFRA interference claims. (*Faust*, *supra*, 150 Cal.App.4th at p. 881.) As the court in *Faust* explained, "certain legal consequences" flow from the fact that an employer "did not give notice to [its employee] of [the employee's] right to leave under . . . CFRA." (*Id.* at pp. 868-869.) Given the absence of evidence to establish, as a matter of law, that Defendant met its CFRA obligations, summary adjudication of Moore's CFRA interference cause of action in favor of Defendant is inappropriate on this record.

Given the numerous conclusions that a fact finder could draw from the evidence Defendant presented in support of summary adjudication of Moore's CFRA interference claim, some of which do not support judgment in favor of Defendant, as well as the absence of evidence that Defendant met its own obligations under CFRA, we must

---

[13] There is evidence in the record from which one could infer that Moore was aware that she might have the right to take leave for medical reasons pursuant to FMLA, given that there is evidence that Moore requested FMLA paperwork from the Human Resources Department. However, one could also reasonably infer from this fact that Moore was unaware of her rights *under CFRA*, since she did not request, and there is no indication that she was provided (despite her failure to request), the paperwork that would be necessary for her to exercise her right to leave under CFRA. Again, we must view the evidence in a light favorable to Moore—and we must resolve any doubts or ambiguities in her favor—for purposes of Defendant's summary judgment motion. (See *Ambriz*, *supra*, 146 Cal.App.4th at p. 1530.)

reverse the trial court's grant of summary adjudication of the fifth cause of action for interference under CFRA.

G.      *We need not consider Moore's evidentiary arguments on appeal*

Moore contends that the trial court's ruling with respect to Defendant's motion for summary judgment was premised on "several evidentiary mistakes."  Specifically, Moore takes issue with (1) the trial court's reliance on certain portions of the Balestrieri's deposition regarding the differences between Moore's former position and that of Shea, (2) the trial court's overruling of Moore's objections to portions of Defendant's evidence on the procedural ground that Moore objected to the separate statement of undisputed facts rather than the foundational evidence on which such facts were based, and (3) the trial court's sustaining of objections to Moore's introduction of certain documents.

We need not address these evidentiary concerns because the correctness of these challenged evidentiary rulings is irrelevant to our determination of the substantive issues raised in this appeal.  Even assuming that the trial court was correct with respect to the evidence that it considered and excluded, the court nevertheless erred in granting summary adjudication in favor of Defendant on Moore's first, second, third, fifth, and sixth causes of action.  Further, nothing about the evidence that Moore contends was either inappropriately excluded or improperly considered could have assisted Moore in establishing that summary adjudication in favor of Defendant was not proper with respect to her fourth cause of action, for retaliation under FEHA.

IV.

DISPOSITION

The court's granting of summary judgment in favor of Defendant is reversed. Defendant is not entitled to summary adjudication in its favor on Moore's first, second, third, fifth, and sixth causes of action. However, Defendant is entitled to summary adjudication in its favor with respect to Moore's fourth cause of action. We remand the matter to the trial court for further proceedings.

Moore is entitled to her costs on appeal.

AARON, J.

WE CONCUR:

McCONNELL, P. J.

HUFFMAN, J.

47

Filed 6/20/16

| | |
|---|---|
| DEBORAH MOORE, | D067120 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2013-00032193-CU-OE-CTL) |
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, | |
| Defendant and Respondent. | ORDER CERTIFYING OPINION FOR PUBLICATION |

THE COURT:

The opinion in this case filed June 2, 2016 was not certified for publication. It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), the requests pursuant to California Rules of Court, rule 8.1120(a) for publication are GRANTED.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to Be Published in the Official Reports" appearing on page 1 of said opinion be deleted and the opinion herein be published in the Official Reports.

McCONNELL, P. J.

Copies to:  All parties

2