Filed 2/3/26  Kalin v. Humboldt County Public Defender's Office CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

|  |  |
|---|---|
| RORY KALIN,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>HUMBOLDT COUNTY PUBLIC DEFENDER'S OFFICE et al.,<br><br>        Defendants and Respondents. | A170294<br><br>(Humboldt County<br>Super. Ct. No. CV-2000357) |

Plaintiff Rory Kalin appeals from the trial court's grant of summary judgment on his retaliation and religious discrimination claims in favor of defendants Humboldt County Public Defender's Office, Luke Brownfield, and Marek Reavis.  We affirm.

## BACKGROUND[1]

In October 2017, Kalin began working for the Humboldt County Public Defender's Office as a deputy public defender, level III, "a position for deputies who are working [on] misdemeanors."  Six months after Kalin was hired, Reavis was appointed as the Humboldt County Public Defender.

---

[1] "Because this case comes to us after a grant of summary judgment, we take the facts from the parties' separate statement of undisputed material facts and the evidence filed in support of and opposition to the motion." (*Dinslage v. City and County of San Francisco* (2016) 5 Cal.App.5th 368, 373.)

Reavis maintained his "initial goal," after assuming the position, "was to 'calm the waters' at the Public Defender's office in order to get past the period of turmoil that followed [his predecessor's] management." Accordingly, when Kalin approached him in October 2018 "seeking a promotion to Deputy Public Defender IV, . . . Reavis agreed to the promotion" and submitted a positive evaluation for Kalin. Brownfield served as the assistant public defender.

From the time Kalin was hired he was prescribed various medications, including medications for anxiety, anti-depression, tranquilizers, and medications to assist with sleep. He was also using cannabis. Neither Reavis nor Brownfield were ever aware of Kalin's anxiety condition or that he was taking these medications.

In April 2019, six months after his promotion, Kalin "was hit in the head with a golf ball," and following the injury, he informed the public defender's office "he had suffered a concussion and took one week off of work" on the advice of his doctor "for brain rest." Upon his return, Kalin "did not initially inform anyone" at the office that "he was unable to work or needed an accommodation." However, "several co-employees noticed [he] did not appear to be doing well and based on his courtroom performance," he was "sent home."

Kalin consulted a physician with complaints of " 'persistent sensations of dizziness[,] queasiness and trouble menially [sic] focusing, and that he "hits the wall" in the afternoons.' " His physician provided two letters, both dated April 24, 2019, which Kalin submitted to the County. The first said Kalin could return to work on April 29 but was limited to working six hours a day and was not to stand for more than four hours a day until May 3, 2019. The second letter stated Kalin could return to work by April 30 without restrictions.

During that spring, Reavis spoke with Judge Kaleb Cockrum privately in his chambers. Judge Cockrum "proceeded to express grave concern about [Kalin's] performance" in his courtroom. He described Kalin's "performance as being 'horrible,' and stated [Kalin] was not a very good lawyer." After speaking with Judge Cockrum, Reavis spoke to Judge Kelly Neel. "Judge Neel was both a former [D]eputy District Attorney and a former Deputy Public Defender." Judge Neel stated Kalin "had done a jury voir dire in her courtroom that was the worst she had ever seen." She described Kalin as being "combative and hostile" and "rude" to the jury. She also stated he "made arguments that were entirely unsupported, and badly misstated facts."

Reavis next spoke to Commissioner Francis Greenleaf and Judge Christopher Wilson. Reavis stated Commissioner Greenleaf "appeared more reticent to criticize [Kalin]," but told Reavis that Kalin "put 'a lot of energy' into his advocacy, which Mr. Reavis interpreted as meaning that [Kalin] was being argumentative." Judge Wilson "did not relay any specifics about Kalin's performance, but he did state he recalled [him] arguing well beyond when a point was over."

Finally, Reavis spoke to Brownfield. Brownfield had received complaints from other deputy public defenders that Kalin "had argued with judges over unimportant issues and, . . . he appeared to be unable to read the room." Additionally, Brownfield observed Kalin "being non-receptive to judges." During bail hearings, Kalin "would talk over judges repeatedly, despite them telling him to stop." Brownfield also recalled Kalin "once badly mishandled a case" resulting in the district attorney "charging the defendant with a felony, when it could have been resolved for a misdemeanor." Finally, Brownfield had received a "complaint from a former juror who complained that [Kalin] had been rude and demeaning to the jury."

Based on the comments and complaints received by Reavis and Brownfield, Reavis decided, in mid-May, to take Kalin off "all felony cases." And, since Kalin would no longer be working on felony cases, "it was further decided that he should be demoted to a Deputy Public Defender III."

Brownfield asked Reavis not to inform Kalin of the demotion until after the upcoming holiday weekend because Brownfield and his wife had invited Kalin on a Memorial Day camping trip, and he thought it "would be awkward if [Kalin] was demoted before the camping trip." Brownfield and his wife held an annual Memorial Day camping trip, and that year, attendees included, among others, Kalin and his wife and Judge Gregory Elvine-Kreis, a longtime friend of Brownfield. Reavis was not in attendance.

The group rented a pontoon boat for the trip. At his deposition, Kalin testified a group of people were headed to the boat ramp, when Judge Elvine-Kreis "loudly" commented to Brownfield, " 'I can't believe you haven't fired this guy yet.' " Kalin stated that, once on the pontoon boat, Judge Elvine-Kreis referred to him "as 'Jew Boy' several times." He also maintained Brownfield was "within earshot" of these remarks because he was on the boat. In his declaration, Brownfield averred he did not "see or hear anything inappropriate going on between [Kalin] and Judge Elvine-Kreis." He saw about 20 people in the water, people on the boat, and several people drinking. He observed Kalin paddling a kayak, and upon return to the pontoon boat, Brownfield "saw Judge Elvine-Kreis push [Kalin] back into the water."

The following month, in mid-June, Reavis and Brownfield met with Kalin to inform him he was being demoted. From that point, Kalin was assigned to handle only misdemeanors. At the time, Reavis was unaware of the antisemitic remarks assertedly made by Judge Elvine-Kreis.

4

Three days after being demoted, Kalin learned his doctor could no longer prescribe him medications because the Drug Enforcement Agency had suspended the physician's license to prescribe controlled substances.[2] A week later, Kalin voluntarily hospitalized himself so he could safely stop taking the medications he had been prescribed.

From the end of June 2019 to January 2020, Kalin remained on medical leave. During this six-month period, his physician sent several notes informing the County Kalin was being treated for a " 'medical condition.' "

While Kalin was on leave, Reavis sent two text messages to him asking when he would return to work.

Jennie Stepanian took over Kalin's case load. She discovered Kalin had not made "a clear plan of attack for the clients," and there were "very few notes" in the files. This required Stepanian to start "anew" on each case. She also received complaints from about 10 clients, who did not know "what the plan was for their case," were "not being informed about their case or their rights," did not know "the status of their case," and with whom Kalin had canceled meetings at the "last minute and never rescheduled."

Reavis examined Kalin's written work, finding "multiple deficiencies." He decided that upon Kalin's return to work, he would be placed on a performance improvement plan, whereby Kalin would take over Reavis's pending case load and relocate to a workspace near Reavis so Reavis could supervise him "more directly."

Accordingly, on Kalin's return to the office in mid-January, Reavis and Brownfield met with him to inform him of the improvement plan and go over the details. Kalin disagreed any such plan was appropriate, and an argument ensued, during which Reavis asked for Kalin to leave the building.

---

[2] The physician retired later that year, in June 2019.

That same day, Kalin informed human resources he was extending his medical leave, and his doctor provided a letter. The letter stated, Kalin "came back to work today and the conditions he returned to exacerbated his underlying medical condition; therefore he needs further medial leave."

Kalin's leave was extended, and his position remained open for more than a year. During that time, from January 13, 2020, to January 15, 2021, Kalin's doctor sent the human resources department several notes stating he was treating Kalin for a medical condition. Each letter also advised of a new return date.

Kalin received benefits throughout this period. The County also sent several requests to him to participate in the interactive process and seeking clarification of his work restrictions/requests for accommodation. Eventually, the County e-mailed Kalin a third request for clarification and, at his request, extended the response time.

Kalin never supplied the requested information. Instead, his attorney sent a letter to the County communicating Kalin's refusal to provide it and "asserting that [he had been] constructively terminated in January 2020."

The County responded by letter dated March 16, 2021, assuring Kalin he was still an employee and his job remained open, and noting that since he had resumed leave on January 13, 2020, the County had had "several communications with [him] about [his] continued employment," had "continued to reach out to [him] throughout [his] extended medical leave[,] and [he had] continued to keep [the County] apprised of [his] need for extended leave," which the County had authorized for over a year. In closing, the County once again asked Kalin to participate in the interactive process.

In September, after having continued to refuse to provide any further information to the County, Kalin was "medically separated" from his

6

employment. In the meantime, Kalin had, for more than a year, been receiving social security benefits for permanent disability.

Kalin then filed suit against the public defender's office, Reavis, and Brownfield (collectively, defendants), alleging 18 causes of action.[3] Defendants interposed a demurrer to two of the causes of action (negligent hiring and breach of a mandatory duty), which the trial court sustained without leave to amend. It subsequently moved for summary judgment on the remaining causes of action, which the trial court granted in full. Kalin then moved for a new trial, which the trial court denied.

On appeal, Kalin challenges the summary judgment only as to two of the causes of action—for retaliation and religious discrimination.[4]

---

[3] Kalin alleged causes of action for religious discrimination (Gov. Code, § 12940, subd. (a)); racial discrimination (*ibid.*); disability discrimination (*ibid.*); failure to reasonably accommodate disability (*id.*, subd. (m)(1)); failure to engage in the interactive process (*id.*, subd. (n)); harassment—hostile work environment (*id.*, subd. (j)(1) & (3)); retaliation (*id.*, subd. (h)); violation of Lab. Code, § 1102.5; retaliation in violation of the Moore-Brown-Roberti California Family Rights Act (CFRA; Gov. Code, §§ 12945.1, 12945.2); failure to prevent discrimination, harassment, and retaliation (*id.*, 12940, subd. (k)); violation of the Ralph Act (Civ. Code, §§ 51.7, 52, subd. (b)); violation of the Tom Bane Civil Rights Act (*id.*, § 52.1); intentional infliction of emotional distress; wrongful termination; negligent hiring, retention, training, and supervision; breach of mandatory duty; intentional interference with prospective economic advantage; and negligent interference with prospective economic advantage.

[4] Kalin did not, in his briefing on appeal, challenge the denial of his motion for new trial and therefore has waived any challenge thereto. (See *Tsasu LLC v. U.S. Bank of Trust, N.A.* (2021) 62 Cal.App.5th 704, 714 (*Tsasu*) [where the plaintiff presented cursory argument for first time in his reply brief as to the denial of a motion for new trial, appellate court limited review to the summary judgment].)

DISCUSSION

*Preliminary Issues*

   *Motion to Strike*

   Defendants move to strike the "entire argument section" of Kalin's opening brief, contending it is "devoid of record citations," "rendering it impossible to test the accuracy of the factual assertions being made" and in violation of the rules of court. (Cal. Rules of Court, rule 8.204(a)(1)(C) [Each brief must "[s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears."].)

   There is, indeed, an absence of record citations in the entirety of the argument section of Kalin's opening brief, and such defect is grounds to disregard the unsupported points therein or to strike the brief in its entirety. As the appellate courts have explained, even if some sections of an appellate brief contain citations to the record, those sections "do not cure the failure to cite evidence in [other sections] of the brief. . . .  To provide record citations for alleged facts at some points in a brief, but not at others, frustrates the purpose of that rule, and courts will decline to consider any factual assertion unsupported by record citation at the point where it is asserted." (*Alki Partners, LP v. DB Fund Services, LLC* (2016) 4 Cal.App.5th 574, 590, fn. 8 (*Alki Partners*), citing *City of Lincoln v. Barringer* (2002) 102 Cal.App.4th 1211, 1239, fn. 16; Cal. Rules of Court, rule 8.204(a)(1)(C) [each brief must "[s]upport *any* reference to a matter in the record by a citation to the volume and page number of the record where the matter appears," italics added].)

   We reject Kalin's assertion that he "substantially complied" (capitalization omitted) with the rules of court by "facilitat[ing]" this Court's review by including, in his closing brief, a table of record citations

8

corresponding to key factual assertions.  Nevertheless, we exercise our discretion to deny the motion to strike.

### *Briefing Deficiencies*

Although we decline to strike Kalin's brief, it is beset with problems that impede appellate review.

#### *Reliance on New Trial Evidence*

Throughout his briefing, Kalin overwhelmingly cites to evidence he proffered in support of his new trial motion.  Because this evidence was not before the trial court when it ruled on defendants' motion for summary judgment, we do not consider it.  (See *Tsasu, supra*, 62 Cal.App.5th at p. 722, fn. 6 [appellate court declined to consider declaration submitted in support of new trial motion in reviewing grant of summary judgment, citing Code Civ. Proc., § 437c, subd. (c) (ruling on summary judgment motion must be based on "papers submitted" with the motion)]; *Szadolci v. Hollywood Park Operating Co.* (1993) 14 Cal.App.4th 16, 19 ["appellate court must examine only papers before the trial court when it considered the motion, and not documents filed later"]; *Albertini v. Schaefer* (1979) 97 Cal.App.3d 822, 829 [on review of summary judgment, appellate court cannot consider declaration submitted in support of new trial motion].)

In apparent defense of his reliance in his opening brief on the showing he made in support of his motion for a new trial, Kalin asserts, in his closing brief, that "evidence properly included in the appellate record may be cited regardless of procedural context."  (Capitalization omitted.)  He cites to *Johnson v. American Standard, Inc.* (2008) 43 Cal.4th 56, 64, which he quotes as stating, " 'on appeal from a summary judgment, [the Court of Appeal] must consider all of the evidence and all of the inferences reasonably drawn therefrom.' "  To begin with, no such quote is found in the case.  In

addition, *Johnson* does not deal with evidence proffered *after* a grant of summary judgment and in support of a new trial motion. Rather, the fundamental principle Kalin purports to recite pertains to review of the evidence submitted in opposition to a motion for summary judgment. As for Kalin's assertion that refusal to consider evidence proffered *after* the grant of summary judgment "would create an absurd procedural trap for appellants," the law as to the impropriety of considering such evidence has, as we have recited, been established for decades. In short, there is no "procedural trap" when it comes to the evidentiary parameters of opposing a motion for summary judgment.

### *Case Citations*

Throughout his briefing on appeal, Kalin makes assertions that are not supported by the cases he cites.

He states, for example, "Reavis's retaliatory intent is further evidenced by his persistent efforts to terminate Plaintiff despite explicit HR directives. In *Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 69 [(*Morgan*)], the court found pretext where an employer deviated from established hiring procedures by manipulating job requirements to exclude a qualified candidate who had previously filed complaints." The *Morgan* court did not make any such a finding.

He elsewhere states, "This pattern of policy violations [by Reavis] is particularly significant under *Arteaga v. Brinks, Inc.* (2008) 163 Cal.App.4th 327, 344, where the court held that departures from established procedures can demonstrate pretext. Like the employer in *Arteaga* who failed to follow progressive discipline policies before termination, Reavis bypassed normal documentation requirements and attempted to impose unauthorized conditions on [Kalin's] return." Later, Kalin asserts, "Just as the *Arteaga*

10

court found summary judgment inappropriate where an employer bypassed progressive discipline procedures, here Reavis's systematic violation of County policies . . . creates triable issues regarding his true motivations." The *Arteaga* court did not find summary judgment inappropriate. Nor did it discuss the employer's progressive discipline policies.

He also asserts his case is akin to *Miller v. Fairchild Industries, Inc.* (9th Cir. 1989) 885 F.2d 498, because the circuit court held temporal proximity between protected activities and adverse actions, alone, creates a triable issue of discriminatory intent and the "court found pretext where positive evaluations suddenly turned negative after protected activity." The circuit court did not hold timing, alone, creates a triable issue of pretext. Nor did it say that about "suddenly" negative evaluations. (See *Miller*, at pp. 505–506.)

He states, "procedural irregularities in this case present compelling parallels to *King v. United Parcel Service, Inc.* (2007) 152 Cal.App.4th 426. . . . Like in *King*, where summary judgment was inappropriate due to suspicious timing and deviation from standard procedures, here Reavis initiated these unprecedented actions following the Lake Shasta incident. . . ." The court did not conclude summary judgment was inappropriate.

He asserts, citing *Davis v. Team Electric* (9th Cir. 2008) 520 F.3d 1080, 1089, that the circuit court therein "specifically recognized that discrimination cases often turn on such circumstantial evidence because 'employers are usually careful enough not to leave a trail of direct evidence.'" No such quote is found in the case.

In short, Kalin has repeatedly violated his obligation to this Court to provide correct citations to the record and to properly cite to legal authority,

11

and we disregard all such incorrect citations and the factual and legal assertions they purportedly support.  (See *People v. Alvarez* (2025) 114 Cal.App.5th 1115, 1119–1120 ["attorneys must check every citation to make sure the case[s they cite] exist[] and the citations are correct," and failure to do so may warrant imposition of sanctions].)

## *The Summary Judgment*

### *Standard of Review*

"A trial court must grant a motion for summary judgment or summary adjudication if the papers show there is no triable issue as to any material fact and the moving party is entitled to judgment as a matter of law.  (Code Civ. Proc., § 437c, subds. (c), (f)(1).)  A triable issue of material fact exists if the evidence reasonably permits a trier of fact to find the contested fact in favor of the plaintiff in accordance with the applicable standard of proof.  (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 . . . (*Aguilar*).)  A defendant moving for summary judgment or summary adjudication may demonstrate that the plaintiff's cause action has no merit, and that the defendant is entitled to judgment as a matter of law by showing that the plaintiff cannot establish one or more elements of the cause of action or there is a complete defense to the cause of action.  (Code Civ. Proc., § 437c, subds. (a)(1), (f) & (p)(2); *Aguilar,* at pp. 849, 853.)  This showing must be supported by evidence, such as declarations and deposition testimony.  (Code Civ. Proc., § 437c, subd. (b)(1).)

"Once the defendant meets its threshold burden, the burden shifts to the plaintiff to present evidence showing that a triable issue of one or more material facts exists as to the cause of action or defense.  (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar, supra*, 25 Cal.4th at p. 850.)  The plaintiff may not simply rely on the allegations of the pleadings but must set forth specific

facts showing a triable issue of material fact as to the cause of action or defense. (Code Civ. Proc., § 437c, subd. (p)(2).)

"We review an order granting summary judgment or summary adjudication de novo, employing the same analysis as the trial court. (*Aguilar, supra,* 25 Cal.4th at p. 860; *Jones v. Awad* (2019) 39 Cal.App.5th 1200, 1206. . . .) First, we identify the issues framed by the pleadings because it is those allegations to which the defendant's motion must respond. [Citation.] We then determine whether the defendant's showing establishes facts negating the plaintiff's claims and justifies a judgment in the defendant's favor. [Citation.] If the defendant makes such a showing, we determine whether the plaintiff has demonstrated the existence of a triable issue of material fact. [Citation.]

"We independently examine the record, considering all the evidence set forth in the papers, except that which the trial court properly excluded, and all inferences reasonably deducible from the evidence to determine whether a triable issue of material fact exists. [Citations.] We view the evidence in a light favorable to the party opposing summary judgment or summary adjudication, liberally construing that party's evidence while strictly scrutinizing the moving party's showing, and we resolve all doubts concerning the evidence in favor of the opposing party. [Citations.] We do not resolve issues of fact and generally do not decide questions about credibility." (*Bakos v. Roach* (2025) 108 Cal.App.5th 390, 395–396.)

### *The CFRA Retaliation Claim*

Kalin does not, either in his opening or closing brief, specify which of his alleged "retaliation" claims he challenges on appeal. In his opening brief, he asserts he "faced adverse action directly after exercising his protected right to medical leave"; "retaliation following [his] June 2019 hospitalization";

13

retaliation, which "intensified during [his] medical leave"; continued retaliation upon his return from medical leave; and that "retaliatory intent" was "evidenced by Reavis's conduct during [his] medical leave." Defendants therefore concluded Kalin's appeal is limited to his CFRA retaliation claim and have addressed only that claim. In his closing brief, Kalin does not take issue with defendants' reading of his opening brief.

We therefore also conclude Kalin challenges only the ruling on his CFRA retaliation claim and has waived any challenge to any other retaliation claim. (See *Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956 [" ' "When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived." ' [Citation.] 'We are not bound to develop appellants' arguments for them. [Citation.] The absence of cogent legal argument or citation to authority allows this court to treat the contention as waived.' "].)

In their motion for summary judgment, defendants maintained Kalin's CFRA retaliation claim failed because the adverse personnel actions taken against him "were born from serious concerns about his job performance, and [he] can point to no substantial evidence suggesting that this was a false reason and that Reavis'[s] true motivations were to retaliate against him."

In his opposition memorandum, Kalin did not specifically address retaliation, much less discuss CFRA. At the hearing on defendants' motion, his attorney argued, "we believe we've made the prima facie showing with respect to the disability and leave discrimination just given the proximity in time in relation to when the demotion occurred. [Kalin] went out on leave in April of 2019. He was returned on restricted duty late April, early May. According to the defendant, the paperwork to start the demotion began in middle of May, so we're talking a couple of weeks between that passage of

14

time.  Case law is clear, the proximity between the protected activity and the adverse employment action in and of itself is sufficient to establish—to make that prima facie showing.  So we believe that that—just timing alone is sufficient to show that."

He additionally asserted, "Turning to the retaliation, there's testimony evidence that Mr. Kalin complained about Mr. Reavis in July of 2019.  Shortly thereafter, Mr. Reavis wanted to terminate [Kalin], and then, in fact, did terminate Mr. Kalin in January.  So he also targeted him along the way by soliciting feedback from other folks in the office. . . . [¶] [I]t goes back to that proximity in time.  The complaint was made in July.  By September, Mr. Reavis is requesting that Mr. Kalin be terminated.  So, again, we believe that right there alone would make the prima facie showing, shifting the burden to the defense.  They are essentially arguing that they took these actions against Mr. Kalin because of his performance.  We believe that's pretextual . . . the reason it's pretextual is because Mr. Kalin was promoted in October 2018.  There [were] no negative performance evaluations.  There were no written reprimands.  There was nothing to suggest that [Kalin] had a performance issue prior to May of 2019. [¶] They also—there was also a deviation from the county policies and procedures.  A deviation from policies and procedures is enough to show pretext.  Ms. Barns testified that it would be policy and procedure for Mr. Kalin to have been put on a performance improvement plan prior to being demoted.  They failed to follow that policy, that procedure or best practices, and, again, that right there would show pretext."  Later counsel argued, "the fact that [Reavis] put him on a performance improvement plan which, you know, shows—why didn't they do that before? . . . He clearly could have.  He's just—he had his own animus, and he was acting out of, you know, disdain for Mr. Kalin, whether it be his

15

religion, whether it be his disability, whether it be the fact that he took leave, whether it be the fact he complained about him, but these are all things that need to be decided by a jury and not by Your Honor here today."

"CFRA, the California corollary to the federal Family and Medical Leave Act of 1993 (29 U.S.C. §§ 2601–2654; FMLA), 'is intended to give employees an opportunity to take leave from work for certain personal or family medical reasons without jeopardizing job security.' [Citations.] CFRA requires an employer of 50 or more persons to grant a request by a qualified employee to take up to 12 weeks in any 12-month period for family care or medical leave. ([Gov. Code,] § 12945.2, subds. (a), (c)(2)(A); see *Faust* [*v. California Portland Cement Co.* (2007) 150 Cal.App.4th 864,] 878.) Grounds for leave include . . . 'an employee's own serious health condition' when that condition 'makes the employee unable to perform the functions of the position of that employee. . . .' [Citation.] CFRA defines a ' "[s]erious health condition" ' as 'an illness, injury, impairment, or physical or mental condition that involves either of the following: . . . [¶] (B) Continuing treatment or continuing supervision by a health care provider.' [Citation.] An employer may require an employee's request for leave be supported by a certificate from the employee's health care provider. [Citation.]

" 'Violations of . . . CFRA generally fall into two types of claims: (1) "interference" claims in which an employee alleges that an employer denied or interfered with her substantive rights to protected medical leave, and (2) "retaliation" claims in which an employee alleges that she suffered an adverse employment action for exercising her right to CFRA leave.' [Citation.] . . . The statutory authority for a 'retaliation' claim arises from

16

[Government Code] section 12945.2, subdivision (*l*)(1),[5] which makes it unlawful to retaliate against any individual because of his or her exercise of the right to family care or medical leave as provided by CFRA." (*Moore v. Regents of University of California* (2016) 248 Cal.App.4th 216, 233 (*Moore*).)

"The elements of a cause of action for retaliation in violation of CFRA are ' "(1) the defendant was an employer covered by CFRA; (2) the plaintiff was an employee eligible to take CFRA [leave]; (3) the plaintiff exercised her right to take leave for a qualifying CFRA purpose; and (4) the plaintiff suffered an adverse employment action, such as termination, fine, or suspension, because of her exercise of her right to CFRA [leave]." ' [Citation.] Similar to causes of action under [the California Fair Employment and Housing Act (Gov. Code, § 12900 et seq.], the *McDonnell Douglas*[6] burden shifting analysis applies to retaliation claims under CFRA." (*Moore, supra,* 248 Cal.App.4th at p. 248.)

" 'At trial, the *McDonnell Douglas* test places on the plaintiff the initial burden to establish a prima facie case of discrimination. This step is designed to eliminate at the outset the most patently meritless claims, as where the plaintiff is not a member of the protected class or was clearly unqualified, or where the job he sought was withdrawn and never filled.' [Citation.] The plaintiff can meet his or her burden of establishing a prima facie case of discrimination by presenting evidence that demonstrates, even circumstantially or by inference, that he or she (1) suffered from a disability, or was regarded as suffering from a disability, (2) could perform the essential

---

[5] Prior to the recent amendment of the CFRA, the retaliation provision was listed as subdivision (*l*). (See Gov. Code, § 12945.2, former subd. (*l*), now subd. (k) [added Stats. 2020, ch. 86, eff. Jan. 1, 2021].)

[6] *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792.

17

duties of the job with or without reasonable accommodations, and (3) was subjected to an adverse employment action because of the disability or perceived disability. [Citation.] To establish a prima facie case, a plaintiff must show ' " ' "actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were 'based on a [prohibited] discriminatory criterion. . . .' " ' " ' [Citation.] The prima facie burden is light; the evidence necessary to sustain the burden is minimal. [Citation.] Generally, an employee need offer only sufficient circumstantial evidence to give rise to a reasonable inference of discrimination." (*Moore, supra*, 248 Cal.App.4th at pp. 234–235.)

" 'If, at trial, the plaintiff establishes a prima facie case, a presumption of discrimination arises.' [Citation.] 'Accordingly, at this trial stage, the burden shifts to the employer to rebut the presumption by producing admissible evidence, sufficient to "raise[] a genuine issue of fact" and to "justify a judgment for the [employer]," that its action was taken for a legitimate, nondiscriminatory reason.'

" 'If the employer sustains this burden [to demonstrate a genuine issue of fact that the action was for a legitimate, nondiscriminatory reason], the presumption of discrimination disappears. [Citations.] The plaintiff must then have the opportunity to attack the employer's proffered reasons as pretexts for discrimination, or to offer any other evidence of discriminatory motive. [Citations.] In an appropriate case, evidence of dishonest reasons, considered together with the elements of the prima facie case, may permit a finding of prohibited bias.' " (*Moore, supra*, 248 Cal.App.4th at p. 235.)

As the courts have explained, although originally adopted for use at trial, the *McDonnell Douglas* framework has been adapted to summary judgment proceedings. "California's summary judgment law places the initial

18

burden on a moving party defendant to either negate an element of the plaintiff's claim or establish a complete defense to the claim. [Citation.] The burdens and order of proof therefore shift under the *McDonnell Douglas* test when an employer defendant seeks summary judgment. [Citation.] An employer defendant may meet its initial burden on summary judgment, and require the employee plaintiff to present evidence establishing a triable issue of material fact, by presenting evidence that *either* negates an element of the employee's prima facie case, or establishes a legitimate nondiscriminatory reason for taking the adverse employment action against the employee." (*Swanson v. Morongo Unified School Dist.* (2014) 232 Cal.App.4th 954, 965–966.)

Once an employer meets its burden, the employee must " ' "offer substantial evidence that the employer's stated nondiscriminatory reason for the adverse action was untrue or pretextual, or evidence the employer acted with a discriminatory animus, or a combination of the two, such that a reasonable trier of fact could conclude the employer engaged in intentional discrimination." ' " (*Morgan, supra*, 88 Cal.App.4th at p. 75.)

### No Triable Issue of Pretext or Discriminatory Animus

Kalin's briefing on appeal is far from a model of clarity. He cites repeatedly to the same, limited evidence. And, as we have discussed, he more than occasionally misstates both the record and the cases on which he relies.

Kalin asserts, for example, that "Reavis systematically violated County procedures regarding [his] medical accommodations after his concussion by failing to forward medical information to HR, never conducting an interactive process meeting, and choosing to 'play it by ear' rather than ensuring proper accommodations."

19

To begin with, Kalin never makes clear what "medical information" Reavis supposedly failed to forward. Kalin provided three physician notes in April 2019 after his concussion, but does not state whether he is talking about the April 13 note directly after his concussion, which did not contain any restrictions but merely stated he would be out on "brain rest protocol" for a week, or the two April 24 notes, the first stating he could return with restrictions, the second stating he could return without restriction. It is not our task to guess what "medical information" Kalin is talking about. (See *Alki Partners, supra,* 4 Cal.App.5th at p. 590, fn. 8.)

Furthermore, a plaintiff cannot create a triable issue on appeal by presenting a theory " 'not fully developed or factually presented to the trial court. . . .' " (*North Coast Business Park v. Nielsen Construction Co.* (1993) 17 Cal.App.4th 22, 31, italics omitted.) While Kalin's attorney argued in the trial court that there had been a "deviation from policies and procedures," he did so referencing only the performance improvement plan. He made no claim that the supposed deviation from procedure consisted of Reavis's asserted failure to forward "medical information" through appropriate channels or that Reavis chose to " 'play it by ear.' "

Kalin's record citations also fail to support his contention that Reavis "systematically violated County procedures regarding [his] medical accommodations after his concussion by failing to forward medical information to HR, never conducting an interactive process meeting, and choosing to 'play it by ear' rather than ensuring proper accommodations." He cites to two excerpts of his own deposition testimony.[7] In the first, Kalin

---

[7] As we have stated, we consider only the evidence before the trial court at the time it ruled on the motion for summary judgment.

20

states he informed Reavis and Brownfield of his golf ball accident, and that he gave "him" the April 13 medical note and was then "instructed by management of my office to go through Georgette Trump, a secretary in our office, who proceeded to then do something with the documentation." In the second excerpt, he states, in response to whether he informed anyone at the county he was taking anxiety medication, that he "had no idea of [his] rights because no one from the County—human resources department, my office, management, Mr. Brownfield, Mr. Reavis, or anyone from the County, for that matter—informed [him] of [his] CFRA, FMLA rights in a situation like this. So those discussions never happened, and neither did the interactive process that would have stemmed from that, unfortunately." When defense counsel repeated the question that had been asked—whether he had informed anyone he was taking medication for or suffering from anxiety—he replied he had not.

In short, neither excerpt supports the claim he has made on appeal— his testimony does not support his accusation that Reavis failed to forward "medical information" or that an interactive process was required, let alone that the County failed to engage in one, or that Kalin was denied any accommodation he requested. To the contrary, the undisputed evidence is that the County repeatedly asked Kalin to engage in the interactive process, but he refused to respond.

Kalin likewise provides no record support for his claim that Reavis's "documented mockery of Plaintiff's medical condition and imposition of work duties during mandated brain rest," evidences discriminatory animus. Indeed, he does not identify what Reavis's supposed "documented mockery" was, let alone provide record citations of such. (See *Miller v. Superior Court* (2002) 101 Cal.App.4th 728, 743 [failure to provide record cites waives issue];

21

Cal. Rules of Court, rule 8.204(a)(1)(C) [appellants must provide record citations].)

In the background section of his opening brief, Kalin asserts he "returned to work due to the immense pressure he received." In support, he cites to another excerpt from his deposition. In this one, he states he returned to work after five days due to "the immense pressure my office was putting on me, management— . . . [and] my counterpart Rosemary Deck." When asked to explain what this pressure was, he replied, "Ms. Deck and I carried the largest case load in the entire office. We have over a thousand open cases at any given time and she just can't do that all by herself." He points to no testimony or any other evidence, however, that Reavis ever used the fact a coworker had to take over the files to pressure Kalin into returning to work (which Kalin did not do except in accordance with the notes from his physician).

Kalin claims the trial court also "disregarded evidence of escalating retaliation following [his] June 2019 hospitalization," which included Reavis's asserted "daily harassment during leave, false statements about 'self-harm,' and attempted termination while Plaintiff was on protected leave. But again, he provides no record citations in support of his argument. (See *Alki Partners, supra,* 4 Cal.App.5th at p. 590, fn. 8.) In the background section of his opening brief, he provides a string of record citations purportedly showing "daily harassment." To begin with, this does not rectify his failure to provide supporting citations in the remainder of his brief. (*Ibid.*) Furthermore, the citations do not establish what he claims.

Kalin again cites to excerpts from his deposition testimony. In the first, he was shown a letter stating he was demoted on June 14, 2019, after a meeting. Kalin stated he did not think June 14 was the correct date. When

22

asked why, he stated, "the management was really horrible at documenting these types of things. . . . There was no—this letter is written now a month—more than a month after this meeting with this alleged narrative. And it only came on the heels of me going out on medical leave. [¶] The real concerning piece to this puzzle—and Mr. Brownfield was in the meeting—is they specifically promised me that there would be no—nothing in writing going into my personnel file, that this would be a reclassification. They were trying to make it seem like—you know, they were demoting me, but they tried to clean it up by saying it would be a reclassification." When counsel asked, "Mr. Kalin, I'm just trying to figure out why you think the date in this letter, June 14th, 2019, isn't the date that you had the meeting" with Reavis and Brownfield, Kalin responded, "I have a slight memory of—when I first saw this, I was like the date was wrong." When asked if he remembered the day the meeting was on, he replied, "No. Because this was an unexpected meeting. . . . I was called into the office unexpectedly, blindsided with false accusations, allegedly coming from the bench and, to me, doesn't fit the narrative of what happened in those courtrooms. . . . It was just like a pretext to get me out of there. [¶] You can just look at the date. It's following the April treatment in the office. It's filing the discrimination and harassment that stemmed from that in my office and the continued harassment, that the boat incident bleeded [*sic*] then into the decisions my office was making. [¶] After I complained—this letter was published after I complained to HR multiple times to have management stop harassment me while I was in a serious medical condition in the hospital for an extended period of time."

In the second excerpt, Paige Smuts, a Human Resources analyst, was asked if by February 2020, "it was well-known with HR that there was an

23

ongoing animus between Mr. Kalin and the PD's Office," Smuts responded, "I would say that our office was well aware that—that Mr. Kalin had concerns both about his leave and about his demotion." Counsel followed up, asking Smut if she "became aware of the tension between Mr. Kalin and the . . . PD's Office back in July of 2019?" Smuts replied, "Based on what Mr. Kalin had stated to me and what his father stated to me, yes, in July 2019 is when I became aware of . . . those concerns."

Neither of these excerpts supports the accusations Kalin has now leveled on appeal—that Reavis engaged in "daily harassment during leave, [and] false statements about 'self-harm.' " In his reply brief, Kalin lists a string of citations assertedly showing Reavis's unauthorized communications. But these are to the same excerpts from his and Paige Smut's depositions discussed above, and they do not show any unauthorized communication, attempts to impose unauthorized conditions, or failure to supply insufficient documentation.

In short, all Kalin can point to is that adverse employment actions followed his taking medical leave. But temporal proximity, alone, does not raise a triable issue of pretext or discriminatory animus after an employer has made a showing that it had a legitimate basis to take the challenged employment actions. (*Arteaga, supra*, 163 Cal.App.4th at p. 353 [while temporal proximity may satisfy the prima facie burden in the first step of the burden-shifting process, "temporal proximity alone is not sufficient to raise a triable issue as to pretext once the employer has offered evidence of a legitimate, nondiscriminatory reason for termination"].)

There is no merit to Kalin's claim the trial court "fundamentally misapplied the *McDonnell Douglas* burden-shifting analysis by failing to properly scrutinize the evidence of pretext once Defendants offered their

purportedly legitimate reasons for the adverse actions." In support of this claim, Kalin cites only to evidence of the temporal proximity of his return to work with restrictions and the initiation of the adverse employment actions. Again, this is legally insufficient to raise a triable issue of pretext or discriminatory animus.

### *Religious Discrimination*

To prove a claim of employment discrimination based on an employee's religious creed, the plaintiff has the initial burden of making a prima facie showing of each of the following: (1) he was a member of protected class (based on religious creed); (2) he was performing competently in the job he held; (3) he suffered an adverse employment action, including, but not limited to termination; and (4) the circumstances suggests discriminatory motive. (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 355.)

Defendants maintained they were entitled to summary judgment because Reavis, the decision-maker, was unaware Kalin was Jewish until after Kalin sued, and even if Reavis "was told at some point" that Kalin was Jewish, there was no evidence Reavis harbored "ill-will toward Plaintiff as a result" of his being Jewish. Further, Kalin's religious discrimination claim was predicated on the notion his demotion and alleged constructive discharge "occurred because the County felt obligated to take punitive actions against [him] after Judge Elvine-Kreis made anti-Semitic remarks about him" on the Memorial Day camping trip. But there is no evidence anyone from the public defender's office knew about those remarks. And even assuming Brownfield was aware of the comments, there was no evidence Brownfield relayed the comments to Reavis or that Reavis's decision to demote Kalin had anything to do with the judge's comments.

While Kalin maintains he did present evidence raising a triable issue of religious discrimination, he has not provided a single citation to the record in support of his argument and thus has failed to carry his burden on appeal. (See *Alki Partners, supra,* 4 Cal.App.5th at p. 590, fn. 8.)  In the background section of his opening brief, Kalin cites to evidence he claims shows procedural "irregularities" in the handling of his demotion, leave, and alleged termination from employment.  However, most of these citations are to evidence proffered in support of his new trial motion, which we do not consider.  Moreover, none of these asserted "procedural" issues raises a triable issue of religious discrimination.

Kalin claims his performance "deficiencies" were "suddenly" raised only after his Jewish heritage became "a focus of workplace discussion."  To this end, he asserts the "record shows that [he] had a conversation with Reavis about his Jewish heritage at Reavis's office Christmas party in December 2018."  He cites to an excerpt from his deposition wherein he said he made a "passing" comment about being Jewish at a holiday party at Reavis's house, in either 2018 or 2019, and Reavis said he wanted to ask him some questions about that.  He also cites to evidence that Reavis once denied a Hannukah leave request on the ground there were " 'coverage issues.' "  None of this supports Kalin's claim his religion "became a focus of workplace discussion." Nor does it raise a triable issue Reavis demoted Kalin and then assertedly terminated his employment because he was motivated by antisemitic bias.

Again, all Kalin can point to is temporal proximity between the comment he made at the Christmas party, assuming it was even made in December 2018 and the judge's supposed comments during the May 2019

26

camping trip,[8] and his demotion in mid-June 2019 and the improvement plan, that he rejected in mid-January 2020. This tenuous timing is insufficient to overcome the County's showing that Kalin was demoted, and then told he was going to be placed on an improvement plan, due to his abysmal work performance. (*Arteaga, supra* 163 Cal.App.4th at p. 353.)

## DISPOSITION

The judgment is AFFIRMED.

---

[8] There is no dispute, however, that the decision to demote Kalin had already been made before the Memorial Day camping trip. There is, in short, no evidence the judge's alleged remarks had anything to do with Reavis's decision to demote Kalin.

_____
Banke, Acting P. J.

We concur:


_____
Langhorne Wilson, J.


_____
Smiley, J.


A170294, Kalin v. Humbolt County Public Defenders